UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

**ARTHUR MILLER,**

       Plaintiff

    -against-                                            **No. 01-CV-1126(RRM)(RML)**

**UPTON, COHEN & SLAMOWITZ,**

       Defendants

-------------------------------------------------------------X

**Plaintiff's Proposed Findings of Fact and Conclusions of Law**

This action arises under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*. Plaintiff Arthur Miller brought this action against three defendants, law firms Wolpoff & Abramson, L.L.P., Upton, Cohen, and Slamowitz, and the National Attorney Network, a referral network created to coordinate debt collection efforts. Miller claimed that defendants had: (1) sent debt collection letters purporting to be from attorneys without any meaningful attorney involvement, in violation of the FDCPA; (2) violated the FDCPA by attempting to collect attorneys' fees that were to be shared improperly between defendant law firms and the National Attorney Network, in violation of state ethics rules; and (3) sent debt collection letters that would confuse the "least sophisticated consumer," in further violation of the FDCPA.

Defendants moved for summary judgment, which was granted on all claims on November 9, 2001, by the district court (Raggi, J.). The Second Circuit reversed with respect to the meaningful-attorney-review issue, and remanded for further proceedings. *Miller v. Wolpoff*

1

*& Abramson, L.L.P.*, 321 F.3d 292 (2d Cir. 2003, Sotomayor, J.), *cert. denied*, 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003).

Following discovery, Miller and Wolpoff entered into a consent judgment.  But the claim against Upton Cohen, specifically that Upton Cohen had violated 15 U.S.C. § 1692e(3) of the FDCPA by sending debt collection letters which suggested that they were from an attorney, but without meaningful attorney involvement, remained. Defendant Upton Cohen then renewed its motion under Rule 56 for summary judgment, which the Court denied.  *Miller v. Wolpoff & Abramson, L.L.P.*, 471 F.Supp.2d 243 (E.D.N.Y. 2007, Dearie, J.).

On June 2-3, 2008, the issue of meaningful attorney involvement under § 1692e(3) was heard before the Honorable Roslynn R. Mauskopf.  Both sides, represented by counsel, presented witnesses and exhibits.  Plaintiff's counsel presents the following findings of fact and conclusions of law:

**Findings of Fact**

1. Plaintiff, Arthur Miller, is a "consumer," as that term is defined by the FDCPA, 15 U.S.C. § 1692a(3). (R. at 178-79).[1]

2. Defendant, Upton, Cohen & Slamowitz, is a "debt collector," as that term is defined by the FDCPA, 15 U.S.C. § 1692a(6).  (R. at 110 lines 9-23).

3. Wolpoff & Abramson, is a "debt collector," as that term is defined by the FDCPA, 15 U.S.C. § 1692a(6).  (R. at 240 lines 9-13).

4. Upton Cohen's practice is to send one collection letter, wait approximately thirty-five days for the debtor to request verification of the debt, and then file an action in New York City Civil Court to collect the debt.  Once a judgment is obtained from Civil Court

---

[1] Citations to the Record are in the following form: "R. at ____."

against the debtor, Defendant's practice is to send post-judgment restraining notices and information subpoenas to the debtor and to all major banks, and to ascertain whether the debtor is employed and, if so, by whom. Most judgments are obtained on default. (R. at 51; 73-74; 82-83; Plaintiff's Ex. 1, 2 (Interrog. Nos. 2, 3, and 18), 6, 7, 12, and 17).

5. Sometime before July 2000, Miller purchased some clothing at Lord & Taylor Department Store for personal use. (R. at 178-79). This purchase was made on a Lord & Taylor store credit card. (R. at 178-79).

6. Miller did not pay his debt, and the account went into default. Miller began receiving collection calls regarding the debt from Lord & Taylor's in-house collectors. (R. at 179-80).

7. Miller sent a dispute letter to Lord & Taylor, dated February 7, 2000. (R. at 180-83; *see also* Plaintiff's Ex. 3).

8. Wolpoff collects debts for Lord & Taylor. (R. at 250). Wolpoff attempted to collect a debt owed by Miller to Lord & Taylor. (Defendant's Ex. 1, 2, and 3).

9. On February 25, 2000, Wolpoff wrote a letter to Miller advising him that it represented Lord & Taylor and was seeking repayment of his debt. (Defendant's Ex. 1).

10. Wolpoff sent another letter on April 26, 2000. (Defendant's Ex. 2).

11. On or about May 4, 2000, Miller sent a dispute letter to Wolpoff. (R. at 184-86; Plaintiff Ex. 5).

12. Wolpoff sent an additional letter on May 31, 2000. (Defendant's Ex. 3). It then decided to sue Miller for the debt. Since its attorneys were not admitted to practice in New York, Wolpoff referred the account to local New York counsel, Defendant Upton Cohen, for suit. (R. at 244-45; 257-58).

13. The National Attorney Network is a software system that allows attorneys in the field of consumer collections to refer matters to each other. (R. at 245 lines 7-10).

14. Abramson became a partner at Wolpoff in 1997. (R. at 239 lines 25). 100% of his practice lies in collections and creditor's rights. (R at 240 lines 12-13). He performed the initial intake from Wolpoff's client, Lord & Taylor. (R at 242 lines 15-16).

15. Abramson testified that when Wolpoff had determined that litigation was appropriate on July 12, 2000, it forwarded the electronic "file" (consisting only of Miller's full name, social security number, current address, telephone number, the Lord & Taylor account number, the amount of the debt, and a notation that Miller was an attorney) to the National Attorney Network, who then forwarded the data in its electronic form (R. at 33 lines 10-16; *see also* Plaintiff's Ex. 1, 12, and 17) to Upton Cohen at Wolpoff's request, because Upton Cohen had already been selected as local counsel to handle Wolpoff's collection matters in the State of New York. (R. at 245 lines 10-15; *see also* Plaintiffs Ex. 1 and 17).

16. In Upton Cohen's notes regarding Miller's case, there was no reference to any dispute letters that Miller sent to Lord & Taylor on February 7, 2000, and to Wolpoff on May 4, 2000. (Plaintiff's Ex. 1, 3, 5, and 17).

17. The only information that Wolpoff sent to Upton Cohen was Miller's full name, social security number, current address, telephone number, the Lord & Taylor account number, the amount of the debt, and a notation that Miller was an attorney. (R. at 32-40; Plaintiff's Ex.1, Ex. 12 (¶ 5), Ex. 17). Upton Cohen did not receive from Wolpoff any of the following documents: billing statements or dispute letters that Miller sent to Lord & Taylor or Lord & Taylor customer notes. (R. at 313-14; Plaintiff's Ex. 1 and 17).

18. If Abramson had a conversation with Upton Cohen regarding Miller's account, he would have made a notation in Wolpoff's file. (R. at 304-06). Because Wolpoff's file for Miller does not reflect any such conversations, Abramson testified that he did not speak with Upton Cohen regarding Miller account at or about the time Wolpoff forwarded Miller's account to Upton Cohen. (R. at 304-06).

19. Upton Cohen does not have access to Lord & Taylor's customer service notes that are contained in Lord & Taylor's computers. (R. at 325 lines 10-14). Similarly, Upton Cohen does not have access to Lord & Taylor's customer service notes that are contained in Wolpoff's computers. (R at 325 lines 15-19).

20. The National Attorney Network does not populate Upton Cohen's database with Wolpoff's account notes when referring a matter to Upton Cohen. (R. at 325; lines 22-24). Upton Cohen must request Wolpoff to provide it with anything in particular that might be in Wolpoff files regarding a particular account – it is not an automatic process. (R at 325 lines 25- R. at 326 lines 1-11).

21. Because Upton Cohen does not have access to Lord & Taylor's or Wolpoff's computers, the only way for Upton Cohen to obtain copies of Lord & Taylor's or Wolpoff's computer records or copies of documents contained in their files is to call a human at Wolpoff to request that information or those documents. (R. at 324-26).

22. Neither Cohen nor Slamowitz asked Wolpoff for any documents or information related to Miller's case. More particularly, they did not ask for copies of settlement offers or dispute letters sent by Miller or for Lord & Taylor's customer notes. (R. at 306-16).

23. Even if Cohen or Slamowitz had called to request materials, Abramson would have been the one to decide whether Upton Cohen had a "legitimate need for them" sufficient to

5

justify having someone at Wolpoff "take[] the time" to provide the materials.  (R. at 315-16).

24. In Abramson's words, neither Cohen nor Slamowitz asked for Miller's file because "They were relying upon my judgment and our firm's judgement with respect to them taking the file."  (R. at 316).

25. On July 18, 2000, Upton Cohen sent Miller a letter, hand-signed by attorney Mitchell Slamowitz, in which it sought payment of $1,676.69.  (Plaintiff's Ex. 6).

26. Mitchell Slamowitz is a partner at Upton Cohen.  Slamowitz has practiced law for over 20 years and handles collection activities for Defendant.  (R. at 65).

27. Cohen, another partner at Upton Cohen, has been practicing law for 28 years, in the field of consumer debt collection.  (R. at 130).

28. The letter from Upton Cohen stated in part: "Please be advised that we are the attorneys for [Lord & Taylor].  The above referenced account has been forwarded to us for collection.  Please contact this office to arrange for payment."  (Plaintiff's Ex. 6).

29. During July 2000, Upton Cohen sent approximately 3,284 initial demand letters to debtors.  (R. at 84 lines 24-25; Plaintiff's Ex. 2, Interrog. No. 11).  Specifically, Upton Cohen sent 211 initial demand letters to debtors on July 18, 2003.  (R. at 84 lines 25- R. at 85 lines 1; Plaintiff's Ex. 2, Interrog. No. 11).

30. Upton Cohen currently has between 100,000 to 150,000 open accounts.  In 2000, Upton Cohen had approximately 50,000 to 75,000 open accounts.  (R at 81-2).

31. In July 2000, from when the file first came into Upton Cohen's office through the point where an answer was filed, Slamowitz was the only attorney who worked on Miller's file.  (R. at 44 lines 15-18; Plaintiff's Ex. 2, Interrog. Nos. 4 and 19).

32. At the time the July 18, 2000 letter was sent out, the only information attorney Slamowitz had was: Miller's full name, social security number, current address, telephone number, the Lord & Taylor account number, the amount of the debt, and a notation that Miller was an attorney.  (R. at 32-40; Plaintiff's Ex. 1, Ex. 12, ¶5; Ex. 17).

33. Before sending the demand letter, attorney Slamowitz did not have a copy of Miller's credit card application, copies or proof of billing statements or credit card receipts, copies of settlement offers or dispute letters sent by Miller to Lord & Taylor or to Wolpoff, or "affidavits of fact" or other affidavits from Lord & Taylor.  (R. at 32-40; 164-65).

34. Before signing and sending initial letters to debtors, attorney Slamowitz claims that he generally does not make any notations on the file unless there is an issue which came up during the review.  (R. at 86 lines 12-16).  (Slamowitz's testimony is incredible because as explained below, he was not assigned to Miller's file until an answer was received on or about November 30, 2000, and Upton Cohen's records reflect that clerical staff did all of the intake work and made all of the decisions on Miller's case as to whether to send out collection letters or to sue.)

35. Slamowitz did not have any specific contact with Lord & Taylor regarding the documents in the Miller file.  (R. at 63 lines 6-14).

36. When the letter dated July 18, 2000 was sent to Miller, Upton Cohen did not have any copies of any dispute letters that Miller sent directly to Lord & Taylor.  (R. at 144-46).

37. At the time the initial letter was sent to Miller, Upton Cohen did not have copies of the signed credit card agreement between Miller and Lord & Taylor; or any credit card receipts or statements concerning Miller's account with Lord & Taylor.  (R. at 146 lines 13-17).

38. Slamowitz had no communications with Wolpoff regarding the facts of this case and did no research on the law governing Miller's account, but that his partner, Cohen, may have. (R. at 59 lines 22- R. at 60 lines 4). Slamowitz also was not aware that Ohio law did not allow for the collection of attorneys' fees in a consumer case such as this. (R. at 60-1).

39. Cohen did not have anything to do with the collection activities on Miller's account, and had no involvement with the collection of Miller's alleged debt. (R. at 101 lines 8-14; Interrog. Nos. 4 and 19).

40. Cohen testified from notes that he was involved in the preliminaries that led to Miller's account being placed at Upton Cohen's office, with establishing a direct relationship with Upton Cohen as attorneys, and Lord & Taylor as client to collect on Miller's account, and with setting up the procedures and working with the National Attorney Network to incorporate a system of communication between the two firms (Wolpoff and Upton Cohen). (R. at 97 lines 14-21).

41. Abramson's testimony flatly contradicted Cohen's testimony. Abramson explained that there was no direct relationship between Upton Cohen and Lord & Taylor. (R. at 281). Wolpoff referred the Miller account directly to Upton Cohen through the National Attorney Network. (R. at 244-45; 298-99). Wolpoff was the at all times "the conduit between Lord & Taylor and Upton Cohen & Slamowitz…." (R. at 244). All communications, inquiries, and document requests had to go through Wolpoff; Upton Cohen did not see anything that Wolpoff did not forward. (R. at 276-78; 281).

42. Slamowitz had no telephonic communication with Wolpoff or Lord & Taylor regarding Miller's account. (R. at 61 lines 16-18).

43. Three years ago in 2005, Slamowitz testified that he personally had done nothing to review Wolpoff's procedures on forwarding accounts. (R. at 81 lines 1-7).

44. There is no indication on the paperless file that Slamowitz -- or any other attorney -- played any role in the review process of Miller's account before sending the initial letter. (R. at 53 lines 3-6; Plaintiff's Ex. 1). Upton Cohen only assigned a lawyer to the file when it received Miller's answer on November 30, 2000. (Plaintiff's Ex. 1). On that day, the code "Attorney" appeared for the first time on Upton Cohen's paperless files, indicated by the change from 1 (being the null number) to 5 (meaning an attorney had been assigned). (Plaintiff's Ex. 1; *see also* R. at 57-8).

45. Miller received a demand letter from Upton Cohen, stating among other things, that the account representative was Mr. V. Brancato, a collector with Upton Cohen. (R. at 187 lines 19-24; *see also* Plaintiff's Ex. 6).

46. Miller had telephone conversations with Brancato. He asked Mr. Brancato if he could speak to a lawyer, to which Brancato responded that he was not allowed to put Miller in touch with a lawyer. (R. at 188 lines 11-13). Miller then asked whether Brancato was aware that he had disputed the claim. (R. at 188 lines 13-14).

47. Miller sent to Brancato copies of all documents he had in his possession via facsimile, which most likely included a copy of Miller's dispute letter to Lord & Taylor dated February 7, 2000 and a copy of Miller's dispute letter to Wolpoff dated February 25, 2000. (R. at 188 lines 19-24); *see also* Plaintiff's Ex. 3 and 5).

48. In 2000, Upton Cohen did not have any procedures in place to obtain copies of such dispute letters sent from debtors to the creditors they claimed to be representing -- in this case, May Company. (R. at 145 lines 16-21).

49. In August 2000, Upton Cohen prepared and signed approximately 3,911 complaints against debtors. (R. 83 at 7-11; Plaintiff's Ex. 2, Interrog. No. 13). Specifically, on August 30, 2000, attorneys with Upton Cohen signed a total of 130 complaints against debtors, including the complaint against Miller. (R. at 84 lines 6-14; Plaintiff's Ex. 2, Interrog. No. 13).

50. On August 25, 2000, Upton Cohen filed a collection action against Miller in Queens County Court seeking recovery of $1,618.14 and $323.63 in attorneys' fees. (Plaintiff's Ex. 7).

51. Tameka Stewart, a paralegal with Upton Cohen, reviewed the file and approved the lawsuit. (R. at 51-52; Plaintiff's Ex. 1).

52. The signature on the summons and complaint against Miller, as well as the sworn verification that its contents are true belongs to Slamowitz. These documents were signed on or about August 25, 2000, before any attorney was assigned to the file. (R. at 54 lines 20-24; *see also* Plaintiff's Ex. 1).

53. There were two causes of action included in the complaint: breach of contract and account stated. (R. at 163 lines 19-23). To prove breach of contract, one must show that there was an underlying agreement. (R. at 163-64). Before sending the letter and filing the lawsuit, however, Upton Cohen did not have Miller's signed agreement (R. at 164).

54. To prove an account stated, one must show that statements actually went out and that they were accepted without dispute. (R. at 164-65). With respect to account stated, Upton Cohen did not have copies of the dispute letters sent by Miller to Lord & Taylor on February 7, 2000, and to Wolpoff on May 4, 2000. (R. at 32-40; 164-65; Plaintiff's Ex. 1, 3, 5, and 17).

55. On or about July 18, 2000, Slamowitz was unaware of what documents were contained in Wolpoff's file on Miller. (R. at 62 lines 21-23).

56. On or about August 25, 2000, Slamowitz was unaware of what documents were contained in Wolpoff's file on Miller. (R. at 63 lines 3-5).

57. It was only on September 5, 2000, after the complaint had already been signed and sent out for service, that Upton Cohen requested back up documents from Lord & Taylor in the form of a "last billing statement" showing the final balance on Miller's account. (R. at 156-57; 277; Plaintiff's Ex. 1, 11, and 17).

58. On November 30, 2000, an answer to the complaint was received by Upton Cohen. (R. at 55 lines 20; Plaintiff's Ex. 1).

59. When testifying, Cohen was unsure of whether Miller had served an answer. (R. at 128 lines 15-18). He stated that he was not testifying from personal knowledge, but rather from a review of Miller's file for the purposes of this litigation. (R. at 129 lines 3-9).

60. On November 30, 2000, the code "Attorney" appeared for the first time on Upton Cohen's paperless files, indicated by the change from 1 (being the null number) to 5 (meaning an attorney had been assigned). (Plaintiff's Ex. 1; *see also* R. at 57-8).

## Conclusions of Law

61. Cohen's testimony is not entirely credible because his testimony was not based on personal knowledge of the facts, documents and events concerning Miller's account, but rather on his review of the files for the purposes of this litigation. The notes Cohen used while testifying were not prepared to help refresh his recollection about aspects of this case, and were drafted at the table, before he testified. As to Miller's account specifically, Cohen's knowledge was based upon a review of his firm's files in connection with the litigation. He has no personal knowledge whatsoever.

62. Before determining that the initial letter should be sent out, Slamowitz, the attorney who signed the letter sent to Miller, viewed only the debtor's name, Social Security number, address, occupation, and the amount allegedly owed. These pieces of information that Slamowitz reviewed were merely ministerial.

63. The actual screen shots do not show Slamowitz's initials at any time before the signing and sending of the letter. Therefore, Slamowitz's testimony regarding his review before the complaint was filed is not credible. The screen shots demonstrate that an attorney had been assigned to the file only after Miller had filed an answer. Because of the volume of demand letters and complaints that are sent by Upton Cohen & Slamowitz's office, it appears beyond dispute that the screen shots accurately reflect the assignment, and the first attorney review of the Miller file took place only after Miller had filed his answer.

64. While Defendant's witnesses testified in great detail and scope regarding review procedures, there was no testimony or other evidence that any meaningful review was done of Miller's particular case. Specifically, testimony has shown that no one saw the

65. The letters and the complaints themselves are basically merged-field documents requiring no independent retention. Further, even if Slamowitz had reviewed the papers, his only task would be to ensure that all the blanks were correctly filled. The Court should find that this does not qualify as meaningful attorney review under § 1692e(3) of the FDCPA, and there has been a deceptive representation that an attorney was meaningfully involved in the case.

66. Although there is no doubt that Wolpoff did review the information, there is uncontradicted testimony from Slamowitz, Cohen, and Abramson, that there were no attempts from Upton Cohen to contact Wolpoff or to request any documents regarding the Miller account before, and even after filing a collection suit in New York State Court.

67. The FDCPA reflects the intent of Congress "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692e.

68. Section 1692e bars debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Id.* It offers a nonexclusive list of impermissible practices, including "[t]he false representation or implication that any individual is an attorney or that any communication is from an attorney." 15 U.S.C. § 1692e(3).

69. In the Second Circuit, the leading case interpreting § 1692e is *Clomon v. Jackson*, 988 F.2d 1314 (2d Cir. 1993). Under *Clomon*, courts evaluating whether a particular practice violates § 1692e must apply an objective standard, asking whether that practice would deceive the "least sophisticated consumer." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993). The goal is "to protect 'the naive' from abusive practices, while simultaneously shielding debt collectors from liability for 'bizarre or idiosyncratic interpretations' of debt collection letters." *Greco v. Trauner, Cohen & Thomas,* 412 F.3d 360 (2d Cir.2005) (quoting *Clomon,* 988 F.2d at 1320).

70. Even a debt collection letter that is literally "from an attorney" may violate § 1692e(3) if it appears likely to deceive consumers through "overstatement of the degree of [that] attorney's involvement in individual debtors' cases...." *Clomon,* 988 F.2d at 1319. *See also Boyd v. Wexler,* 275 F.3d 642, 644 (7th Cir.2001) ("A lawyer who merely rents his letterhead to a collection agency violates the [FDCPA].").

71. *Clomon* also declares that "the use of an attorney's signature on a collection letter implies that the letter is 'from' the attorney who signed it; it implies, in other words, that the attorney directly controlled or supervised the process through which the letter was sent." *Id*. at 1321. Thus in order not to violate § 1692e(3), a debt collection letter that appears over a lawyer's signature must reflect "meaningful attorney involvement." *Miller v. Wolpoff & Abramson,* 321 F.3d 292, 305 (2d Cir.2003).

72. The meaningful involvement requirement may be relaxed where a debt collection letter is signed by an attorney but includes a disclaimer about the extent to which attorneys are involved in reviewing individual debtors' cases. *Greco*, 412 F.3d at 364-65. *See also Pujol v. Universal Fidelity Corp.,* No. 03 CV 5524, 2004 WL 1278163, *5, 2004 U.S.

14

       Dist. LEXIS 10556, at *17-18 (E.D.N.Y. June 9, 2004) (summary judgment for defendants where letter contained disclaimer). *But see Sparkman v. Zwicker & Associates,* 374 F.Supp.2d 293, 302 (E.D.N.Y.2005) (summary judgment for plaintiff where disclaimer was "discursive and confusing").

73. Elsewhere, however, an attorney who signs a debt collection letter must have some basis for believing that the individual to whom the letter is addressed owes a debt to his client, and that the debt is overdue. "[M]erely being told by a client that a debt is overdue is not enough." *Miller,* 321 F.3d at 304.

74. In *Clomon,* the court granted summary judgment for the plaintiff where the attorney whose signature appeared on the challenged letter "played virtually no day-to-day role in the debt collection process." 988 F.2d at 1320.

75. Upton Cohen's reliance on Wolpoff was unreasonable because, through his examinations, Plaintiff demonstrated that Upton Cohen did not undertake any further investigation of Wolpoff's policies and procedures, and, more specifically, the miniscule amount of information regarding the Miller account that it received.  Rather, Slamowitz unreasonably relied on the recommendations of another party, which requires independent inquiry in the validity of the debt and all of the circumstances surrounding the transaction, such as disputes or settlement offers.  Slamowitz's testimony makes it apparent that he was only vaguely familiar, if at all, with Wolpoff's procedures on handling such cases, and that he had no knowledge of the details regarding Miller's particular case.  His testimony indicates he knew next to nothing regarding the way Wolpoff handled Miller's file and regarding the file itself, on the day that he signed the letter to Miller.

76. Further, Upton Cohen's electronic filing system demonstrates that no Upton Cohen attorney reviewed Miller's file prior to Slamowitz's sending its initial letter to Miller. Slamowitz's testimony that he did review the file is not credible, because it is undermined his firm's own business record, which unequivocally demonstrates that no attorney was assigned to the file until Miller filed an answer. Indeed, given the volume of files and cases that Upton Cohen handles, no other conclusion is possible.

77. Moreover, not only did Upton Cohen not conduct a meaningful review of the Miller account itself, it never called Wolpoff to request any materials that were in existence before it sent out a collection letter and filed suit. These materials included dispute letters sent by Miller, settlement offers, and Lord & Taylor account notes. Abramson's unrebutted testimony makes it clear that Upton Cohen first requested information regarding the Miller account to supplement the wholly inadequate for review information received electronically upon the assignment of the account only after Miller filed an answer. Accordingly, Upton Cohen's reliance on Wolpoff's review was not reasonable.

78. Upton Cohen violated 15 U.S.C. § 1692e(3) of the FDCPA by sending debt collection letters which suggested that they were from an attorney, but without meaningful attorney involvement.

79. Plaintiff is entitled to recover $1,000 in statutory damages under 15 U.S.C. § 1692k(a)(2)(A) as a result of the FDCPA violations of Defendant Upton Cohen. This statutory damage recovery is supported by 15 U.S.C. § 1692k(b), because Defendant Upton Cohen appears to have treated tens of thousands of consumer collection accounts in precisely the same manner, signing collection letters and then filing suit with little, if any, attorney review, and then attempting to cover up the fact that no attorney is assigned

16

    to a file except on those rare occasions that a consumer answers the complaint. This award is further justified, because Upton Cohen's conduct was egregious in that it appeared that this Defendant was engaging in a non-attorney clerk-driven collections and litigation as part of an effort to recover quick and easy payment by using attorney letterhead to scare consumers into making payment. If that failed, Upton Cohen's non-attorney clerks court review "files" and approve them for suit in order to obtain and execute upon default judgments, thereby denying multiple consumer defendants of their right to due process. Finally, this award is justified by the need to deter Upton Cohen from violating the FDCPA in the future and to ensure that Upton Cohen conducts meaningful attorney review from now on.

80. Under Fed.R.Civ.P. 54(d)(2)(B), Plaintiff is ordered to file an application for attorney's fees and expenses to be filed 30 days from the date of this order.

**Certificate of Service**

I, Brian Bromberg, an attorney, hereby certify that on June 20, 2008, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Eastern District's Local Rules, and/or the Eastern District's Rules on Electronic Service upon the following parties and participants:

Chris V. Langone langonelaw@gmail.com
Lance A. Raphael lance@caclawyers.com
Brian L. Bromberg brian@brianbromberg.com
Thomas A. Leghorn leghornt@wemed.com
Mark K. Anesh mark.anesh@wilsonelser.com
Brett Scher scherb@wemed.com

Dated: June 20, 2008

/s/ Brian L. Bromberg
Brian L. Bromberg

Brian L. Bromberg
Bromberg Law Office, P.C.
40 Exchange Place, Suite 2010
New York, NY 10005
Tel: (212) 248-7906