UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------X

ARTHUR MILLER,

                Plaintiff,

        - against -

UPTON, COHEN & SLAMOWITZ,

                Defendant.

-----------------------------------------------------X

MAUSKOPF, United States District Judge.

MEMORANDUM, DECISION
AND ORDER AFTER
BENCH TRIAL
01-CV-1126 (RRM)(RML)

Plaintiff Arthur Miller's claims against Defendant Upton, Cohen and Slamowitz ("UCS")
having been tried before this Court in a non-jury proceeding, and based on a preponderance of
the evidence and on the arguments presented, this Court sets forth the following Findings of Fact
and Conclusions of Law,[1] pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, and
finds that UCS is liable for violations under the Fair Debt Collection Practices Act ("FDCPA"),
15 U.S.C. § 1692e.

## PROCEDURAL HISTORY

In February 2001, Miller commenced this action against Defendant law firms Wolpoff &
Abramson, L.L.P. ("Wolpoff") and UCS, as well as the National Attorney Network ("NAN").

On November 9, 2001, then-District Judge Reena Raggi granted Defendants' motions for
summary judgment on all claims. On appeal to the Second Circuit, the grant of summary
judgment was substantially affirmed; however, the matter was remanded for further development
of the factual record concerning the single issue of whether or not Wolpoff and UCS had
conducted a sufficiently meaningful attorney review of Miller's file as implied by the debt-

---

[1]     To the extent that any of the findings of fact may be deemed conclusions of law, they shall also be
considered conclusions. Likewise, to the extent that any of the conclusions of law may be deemed findings of fact,
they shall be considered findings. See Miller v. Fenton, 474 U.S. 104, 113-14, 106 S. Ct. 445, 451-52, 88 L. Ed.2d
405, 413-14 (1985) (noting the difficulty, at times, of distinguishing findings of fact from conclusions of law).

collection letters sent to Miller and as required under FDCPA § 1692e. Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292 (2d Cir. 2003) (referred to herein as "Miller I").

Upon remand and additional discovery, Defendant Wolpoff entered into a consent judgment dispositive of Miller's surviving FDCPA claim against it; Miller's identical claim against UCS was not settled. Thereafter, UCS renewed its summary judgment motion, which our predecessor Court denied. Miller v. Wolpoff & Abramson, L.L.P., 471 F. Supp. 2d 243 (E.D.N.Y. 2007) (Dearie, C.J.) (referred to herein as "Miller II").

On June 2-3, 2008, the meaningful-attorney-involvement claim against UCS was fully litigated before this Court.

## FACTUAL FINDINGS

Upon due consideration of the developed factual record, including the testimony of witnesses and examination of exhibits presented at trial, this Court sets forth the following factual findings based on the credible evidence presented at trial:

1.      In early 2000, Miller purchased clothing at department store retailer Lord & Taylor, using a Lord & Taylor credit card.[2] For various reasons, Miller defaulted on that debt. Thereafter, Miller began receiving debt-collection calls from Lord & Taylor's in-house debt collection personnel.

2.      On or about February 7, 2000, Miller sent to Lord & Taylor, via certified mail, a two-page letter disputing Lord & Taylor's charges, interest and fees and, among other things, reiterating a prior verbal offer to settle the dispute for the sum of $750. Although Miller could not recall whether Lord & Taylor responded to that letter, there is no evidence to suggest that he did.

---

[2]      The Court notes that during the relevant time period, Lord & Taylor was a subsidiary of The May Department Store Company ("May"). As such, Lord & Taylor private label credit cards, like the one used by Miller here, were issued by another May subsidiary, the May National Bank of Ohio.

3.     The next communication regarding that debt was a debt-collection letter dated February 25, 2000 from Wolpoff, Lord & Taylor's outside counsel, based in Maryland. Wolpoff advised Miller that it represented Lord & Taylor and was seeking repayment of his Lord & Taylor debt. On or about April 26, 2000, having no answer to its initial letter, Wolpoff followed-up with a second debt-collection letter, which was mailed to Miller on or about April 26, 2000.

4.     Miller testified that, on or about May 4, 2008, he sent a dispute letter directly to Wolpoff. Among other things, Miller again disputed the Lord & Taylor charges, objected expressly to the imposition of interest and fees, and renewed his offer to settle the matter for $750.[3] Wolpoff did not directly respond to the substance of Miller's May 4, 2000 letter, but sent a third debt-collection letter on May 31, 2000, which included an authorized settlement for 80% of the outstanding balance alleged (an amount identified as $1,294.51).

5.     Receiving no response to its May 31, 2000 letter, Wolpoff sought to commence formal legal action. In that regard, Wolpoff partner Ronald M. Abramson testified, in relevant part, as follows:

> We had sent Mr. Miller three different letters inviting him to voluntarily pay his Lord & Taylor account. We had made some attempts to telephone him as well in an effort to voluntarily settle the matter and ultimately determined because he was not responding to any of our efforts that it was appropriate that litigation be commenced against him.

6.     As Miller was, and is, a New York resident, Wolpoff referred the matter to UCS, its long-standing New York local counsel. That referral was conducted on or about July 12, 2000, via NAN, a third-party information exchange service.

---

[3]     The Court notes that, unlike Miller's February 7th letter to Lord & Taylor, Miller did not introduce a return receipt evidencing mailing and delivery of the May 4th letter at trial. Nonetheless, the Court finds credible Miller's testimony that he did, in fact, mail the May 4th letter to Wolpoff. The Court also finds that, based on the nature and volume of Wolpoff's business, that the fact that the letter does not appear in Wolpoff's paper file on this matter is suggestive of clerical error at Wolpoff.

7.     Via NAN, Wolpoff transmitted to UCS the following information relevant to Miller's debt-collection file: (i) Miller's full name, (ii) social security number, (iii) current address, (iv) telephone number, (v) the Lord & Taylor account number, (vi) the amount of the debt, and (vii) a notation that Miller was an attorney.

**UCS Debt-Collection Letter and Legal Action**

8.     On July 18, 2000, based on the above information, UCS sent Miller a debt-collection letter that is the principal subject of this dispute. The letter, printed on UCS letterhead, identified UCS as attorneys for Lord & Taylor, identified Miller as the debtor, identified Lord & Taylor as the creditor, provided a UCS file number for the matter, identified "V. Brancato" as the UCS account representative on the matter, and identified Miller's alleged balance as $1,676.79. The letter was hand-signed by UCS attorney and partner Mitchell Slamowitz.

9.     The contents of UCS's July 18th letter are set forth, in relevant part, as follows:

DEAR ARTHUR MILLER:

PLEASE BE ADVISED THAT WE ARE THE ATTORNEYS FOR THE ABOVE CREDITOR. THE ABOVE REFERENCED ACCOUNT HAS BEEN FORWARDED TO US FOR COLLECTION. PLEASE CONTACT THIS OFFICE TO ARRANGE FOR PAYMENT.

### VALIDATION NOTICE

UNLESS YOU DISPUTE THE VALIDITY OF THIS DEBT OR ANY PORTION THEREOF WITHIN 30 DAYS AFTER RECEIPT OF THIS NOTICE, THE ABOVE DEBT WILL BE ASSUMED TO BE VALID BY THIS OFFICE. SHOULD YOU NOTIFY THIS OFFICE IN WRITING AT THE ADDRESS SHOWN ABOVE WITHIN 30 DAYS AFTER RECEIPT OF THIS NOTICE THAT THE DEBT OR ANY PORTION THEREOF IS DISPUTED, WE WILL OBTAIN AND MAIL TO YOU VERIFICATION OF THE DEBT OR A COPY OF THE JUDGMENT, IF ANY, AND IF ALSO REQUESTED, THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR, IF DIFFERENT FROM THE CURRENT CREDITOR.

4

THIS COMMUNICATION IS FROM A DEBT COLLECTOR AND IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.
VERY TRULY YOURS,

LAW OFFICES OF UPTON, COHEN AND SLAMOWITZ

10.     On August 25, 2000, UCS filed a collection action against Miller in Queens County Court alleging causes of action for (a) breach of contract and (b) account stated, seeking recovery of the $1,618.14 alleged debt and $323.63 in attorneys' fees. The summons and complaint, as well as the requisite attorney verification were each signed by Slamowitz.

11.     Miller filed his answer to the complaint on November 30, 2000.

12.     The matter was fully resolved on July 25, 2001, when Miller and Lord & Taylor entered into a Stipulation of Settlement.

**FDCPA Claims**

13.     Notwithstanding resolution of the underlying debt dispute, Miller alleges that UCS's conduct in the issuance of the July 18, 2000 debt-collection letter and the filing of the Queens County complaint violated provisions of the FDCPA. Specifically, Miller claims that, despite the implication of a thorough attorney review conveyed by Slamowitz's signature on UCS's July 18th debt-collection letter and County Court pleadings, UCS, in fact, issued both the July 18, 2000 debt-collection letter and the complaint without any effort to meaningfully investigate or determine the validity of the alleged debt as required by the FDCPA.

14.     UCS denies Miller's claim, arguing that its actions regarding Miller's file were wholly adequate for FDCPA purposes. First, UCS contends that the preceding, thorough review of Miller's file by Wolpoff's attorneys lent substantial reliability to the review process, thereby lessening the required depth and breadth of UCS's subsequent review. Second, UCS argues that

independent of Wolpoff's review, its own procedures were sufficient for FDCPA purposes. The Court makes the following findings of fact regarding the attorney review procedures both at Wolpoff and at UCS, based on the credible evidence presented at trial.

**Wolpoff's Attorney Review**

15.    Wolpoff attorney Ronald Abramson, a Wolpoff partner since 1993, with significant experience in debt-collection and creditors' rights law, was called as a witness by UCS. He testified that Wolpoff typically served as Lord & Taylor's debt-collection counsel and had represented Lord & Taylor in all of their Washington D.C. metro-area litigation since approximately 1970, a nearly 40-year client-attorney relationship.

16.    Abramson testified that throughout that relationship, Lord & Taylor was among Wolpoff's most reliable clients with respect to the accuracy of its debt-collection files, its ability to provide supporting materials, and its willingness to fully participate in litigation where necessary. Abramson further testified that by 2000 he had, on "numerous occasions," reviewed Lord & Taylor's credit card terms and conditions, and had "handled numerous files and litigated many matters" on their behalf. In addition, Abramson personally visited Lord & Taylor's collections center, and had, in fact, conducted debt-collection and creditors' rights training for Lord & Taylor's in-house collections personnel, such that he was "intimately familiar" with Lord & Taylor's collections operations as of 2000.

17.    With respect to Wolpoff's review of Miller's file specifically, Abramson outlined the following chronology and events:

a.    On February 23, 2000, Wolpoff received Miller's file from Lord & Taylor. Pursuant to Wolpoff's practice, the file was reviewed by non-attorney personnel to determine the propriety of pursuing payment on accruing interest – an option not pursued in Miller's case. As

6

was typical, Miller's file was then subjected to various third-party screening services, by which Wolpoff investigated common causes for debtors' non-payment and non-responsiveness, including a debtor's death or declaration of bankruptcy – factors legally precluding collection efforts against debtors or their surviving estates. Subsequent to that screening process, Abramson testified that he personally reviewed Miller's account to determine whether or not a debt-collection letter properly should issue. Indeed, on February 23, 2000, Abramson personally entered an electronic notation in Miller's file to indicate his personal review of the matter prior to issuance of Miller's debt-collection letter.

      b.    In making that determination, Abramson testified that he considered the terms and conditions of Miller's Lord & Taylor credit card contract, which fixes the applicable state law, a critical component in assessing whether to initiate collection efforts. He further reviewed Lord & Taylor's "referral information package," which indicated the following: (1) that Miller had disputed the debt; (2) that Miller had offered a reduced settlement on the account; (3) that Miller had sent Lord & Taylor a cease and desist letter demanding that they not contact him further; and (4) that the matter was referred for litigation because Lord & Taylor was without recourse in its dealings with Miller. In addition, Miller's file contained the following basic detail: Miller's name, his address, social security number, date of birth, home and work telephone numbers, a notation that Miller was an attorney, the outstanding account balance and the "charge off"[4] date for that account. Finally, Miller's file indicated that Miller had never written "bad" checks to Lord & Taylor, that is, checks written upon an overdrawn account.

---

[4]      The "charge off date" is the date upon which Lord & Taylor referred the matter for collection and removed Miller's debt from its active account receivables; which, in this case, was 180 days from Miller's last payment on the account.

c.       In sum, Abaramson testified that his decision to issue a debt-collection

letter to Miller was based on his review of the complete data file maintained by Lord & Taylor,

and on his personal confidence in the reliability and accuracy of that information:

> [C]ritically[,] I had the actual information that Lord & Taylor kept in their
> computer systems. It is unaltered information, and it was the same exact
> information that they used to create billing statements. That was sent
> directly from Lord & Taylor to my office. No one else touched it. No one
> altered it. No one changed it. And so I know, after having represented
> Lord & Taylor for seven years personally, but our firm [having
> represented Lord & Taylor] for 30 years, by that point I know their
> information to be accurate, trustworthy, and reliable and unaltered when
> sent to us.
>
> And after reviewing the customer service notes and all of the
> information that I had just explained to you, I made a considered
> professional judgment that it was appropriate to merely send a validation
> letter to Mr. Miller. ...

As stated above, having failed to receive a response from Miller, Wolpoff determined that legal

action was necessary and ultimately referred the matter to UCS in New York.

d.       Via NAN, Wolpoff transmitted some relevant data to UCS. But in using

an intermediary, Wolpoff's ability to transmit the whole of its Miller debt-collection file was

substantially constrained by the parameters of NAN's software. Indeed, the information actually

conveyed to UCS consisted principally of Miller's basic identifying information; e.g., Miller's

full name, social security number, current address, telephone number, the Lord & Taylor account

number, the amount of the debt, and Miller's occupation as an attorney – all of which

corresponded to the NAN software's preset data fields. The data available to UCS did not

include more comprehensive information contained in Wolpoff's own file, which included, for

example, a record of Miller's dispute letter and offer of settlement to Lord & Taylor, and

Wolpoff's own May 31, 2000 offer of settlement. Additionally, because Wolpoff, not UCS,

maintained the Lord & Taylor client relationship, UCS did not have direct access to Lord &

Taylor's file, which included, among other things, the controlling credit card agreement, Miller's correspondence, Miller's complete credit card payment history, and documentation of Lord & Taylor's internal collection efforts. Indeed, retrieval of any information beyond basic "pedigree" information about the debtor required UCS to directly contact Wolpoff or vice-versa – which did not happen in this case.

**UCS's Attorney Review**

General Procedures

18.     UCS partner David A. Cohen testified with respect to UCS's general procedures, policies and practices in connection with debt-collection matters, including Miller's case.

        a.     Cohen testified that, like Wolpoff, UCS too had robust measures in place to prescreen debt-collection matters in order to ensure the accuracy of the data and to ensure that debt-collection measures were employed appropriately. Essentially, Cohen testified that his input in establishing UCS's review procedures could fairly be characterized as an additional level of meaningful attorney review applicable to each and every UCS debt-collection matter:

> I was involved in the preliminaries that led to the account being placed with our office. I was involved with the retention of the client. I was involved with the setting up [of] procedures and – working with National Attorney Network to incorporate a system of communication between the firms so that we could obtain the requisite information and process it properly.
>
> The file – the claim itself would not have come into our system and into Mitchell's [Slamowtiz] attention to review the letter if we had not performed all of the advance work, all of the preliminary work to make that possible. This is not a claim that came into the office magically. We had a relationship with the client. We had been working with that client for many years. This was another claim that came into the office. It was a client that I had worked on and I was familiar with.
>
> So I would say I was integral in setting up the systems that our office utilized – to accept the claim so that Mr. Slamowitz was able to review the claim.

9

b. In addition to Cohen's oversight of UCS's internal procedures, he testified that UCS had a strong working relationship with Wolpoff and that, with respect to matters referred from Wolfpoff to UCS, as Miller's case was, UCS's procedures reflected an understanding and confidence in Wolpoff's initial review. To wit, Cohen testified that he personally visited Wolpoff's offices and had become familiar with their review procedures, particularly with respect to Lord & Taylor matters:

> When we took on the client [Lord & Taylor] they explained how they handled the account, and I got the understanding from May National Bank and from them that they would like our office to fashion our actions after those of – using Wolpoff & Abramson as a model.
>
> Q. Prior to July 2000, had you become familiar and acquainted with the procedure used by Wolpoff & Abramson in their collection efforts on behalf of May National Bank?
>
> THE WITNESS: Yes. When I visited them [Wolpoff] it [May National Bank] was one of the clients we went over, and one of the clients, when they [Wolpoff] visited us, we had discussed. I was familiar with their [Wolpoff's] practices that he [Abramson] had placed.

In sum, Cohen described his familiarity with and confidence in Wolpoff's debt-collection policies.

c. Notwithstanding Cohen's description and characterization of the screening procedures at UCS, it is clear from the credible evidence presented at trial that after a perfunctory bankruptcy and decedent review, UCS's computer system would permit, and did permit, a debt-collection letter to be generated upon a bare minimum of data. Indeed, a debt-collection letter could be generated on little more than the debtor's identifying information, the client name, and the balance due.

Attorney Mitchell Slamowitz's Involvement

19.     The record at trial indicates that UCS actions with regard to Miller's debt were altogether divorced from either Wolpoff or from Lord & Taylor. Apart from the basic identifying information provided through NAN, Slamowitz testified that on neither of the relevant action dates – July 18, 2000, the date the collection letter was sent, nor August 25, 2000, the date the County Court complaint was filed – was he aware of what additional information, if any, was maintained either by Wolpoff or Lord & Taylor with respect to Miller's debt. Indeed, at the time that Slamowitz signed and issued Miller's debt-collection letter, he did not have access to many of the documents that Abramson had reviewed, which documents Abramson testified were relevant to his decision to issue Wolpoff's debt-collection letters. That information included Miller's Lord & Taylor credit card application, monthly billing statements, and his correspondence with both Lord & Taylor and Wolpoff.

20.     To the extent that Miller's file was physically reviewed by UCS personnel, those persons were non-attorneys. For example, electronic notations on Miller's UCS file indicate that on July 24, 2009, Vito Brancato, a UCS staffer, ordered Miller's credit bureau report, a document used to assess a debtor's likelihood of payment on the debt. The electronic file further indicates that Brancato reviewed that report on August 10, 2000. Slamowitz testified, however, that he took no part in that process.

21.     Similarly, on August 25, 2000, UCS paralegal Tameka Stewart entered an electronic notation that she had reviewed Miller's file and that she had approved a summons and complaint to be printed. Again, Slamowitz testified that he played no role in that decision or in the drafting of the documents.

22.     Although Slamowitz signed the July 18, 2000 debt-collection letter and the August 2000 summons and complaint, UCS's electronic records reflect no attorney involvement

11

with Miller's file until November 30, 2000, when, for the first time, Slamowitz initials appear in UCS's electronic Miller file.

23. In fact, on July 18, 2000, Slamowitz and Cohen personally signed 211 collection letters, including Miller's; in that month alone they signed and issued over 3,000.

## CONCLUSIONS OF LAW

The Fair Debt Collection Practices Act, 15 U.S.C. § 1692e, establishes a general prohibition against the use of a "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692(e). Prohibited practices include a "false representation or implication that any individual is an attorney or that any communication is from an attorney." Id.

Notwithstanding the fact that UCS is a law firm, and that the letter sent to Miller was literally 'from' an attorney, the Second Circuit requires "some degree of attorney involvement ... before a letter will be considered 'from an attorney' within the meaning of the FDCPA." Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003) (defined above as "Miller I"). Viewed in the eyes of the "least sophisticated consumer," the standard adopted by the Second Circuit in Clomon v. Jackson, 988 F.2d 1314, 1318-21 (2d Cir. 1993),[5] the necessity for "meaningful" attorney involvement becomes clear: to the least sophisticated consumers, for whom the FDCPA was enacted, an attorney's signature implies that an attorney directly controlled or supervised the process through which the letter was sent, and that the signing attorney has personally considered, and formed a specific opinion about, the individual debtor's case. Miller I, 321 F.3d at 300; Clomon, 988 F.2d at 1321; Goins v. Brandon, 367 F. Supp. 2d

---

[5]     The least sophisticated consumer standard is applied in the Second Circuit. Clomon, 988 F.2d at 1320. This standard differs somewhat from the "unsophisticated consumer" standard employed by other Circuits. See, e.g., Avila v. Rubin, 84 F.3d 222, 226 (7th Cir. 1996). Under either standard, however, a debt-collection letter sent on attorney letterhead implies meaningful attorney review and thus violates the FDCPA where such review is not actually undertaken. See Avila, 84 F.3d at 229 (relying on Clomon, 988 F.2d at 1320).

240, 244 (D. Conn. 2005). Where no such review is undertaken, the failure of an attorney's letter to expressly disclaim that fact runs afoul of the FDCPA. Compare Miller I, 321 F.3d at 306, with Greco v. Trauner, Cohen & Thomas, L.L.P., 412 F.3d 360 (2d Cir. 2005).

The necessity for close scrutiny of attorney debt collection letters[6] was best articulated in the Seventh Circuit's decision in Avila v. Rubin, 84 F.3d 222 (7th Cir. 1996). There the court stated:

> An unsophisticated consumer, getting a letter from an "attorney," knows the price of poker has just gone up. And that clearly is the reason why the … [collection process] escalates from the collection agency, which might not strike fear in the consumer, to the attorney, who is better positioned to get the debtor's knees knocking.

Avila, 84 F.3d at 229. As such, enforcement of FDCPA §1692e against law firms is designed to prevent law firms from renting their letterhead to creditors as mere means to better "strong-arm" putative debtors.

That a law firm is merely renting its letterhead is often evinced by certain facts, including: the use of computer generated form letters; use of facsimile signatures; and the high-volume of letters issued. See Clomon, 988 F.2d at 1321 (holding that few, if any, cases in which mass-produced debt collection letters are used will comply with the FDCPA); Boyd v. Wexler, 275 F.3d 642, 648 (7th Cir. 2001) (holding that the high volume of mail handled by the debt-collecting attorney was relevant to his credibility because the volume of mail suggested both that the attorney might not have had time to review the file and that he might not remember it accurately). But cf. Mizrahi v. Network Recovery Srvs, Inc., infra. In its previous review of this case, the Second Circuit held that UCS may be liable if the evidence demonstrated that UCS "reviewed the collection files with such speed that no independent judgment could be found to

---

[6] Here, the letter sent to Miller was referred to as a "debt validation letter" in accordance with § 1692g. For purposes of this analysis, there is no material difference between a "debt validation letter" and a "debt collection letter," and the terms are used interchangeably. See Avila, 84 F.3d at 226.

have been exercised, and then issued form collection letters with the push of a button." Miller, 321 F.3d at 306. The credible evidence presented at trial has yielded no facts to demonstrate the exercise of independent attorney judgment in connection with Miller's file; indeed, this Court now concludes that, with respect to Miller's case, UCS's attorney review practices prior to both the issuance of the debt-collection letter signed by Slamowitz and the commencement of legal action were inadequate for FDCPA purposes, thus rendering misleading these communications with Miller.

## I

## **Sufficient Attorney Review**

The Second Circuit has declined to set out minimum standards regarding what steps an attorney should take and what documents he or she should review prior to sending out a collection letter or commencing legal action. In considering UCS's specific efforts here, however, the Second Circuit determined that mere review of Miller's full name, social security number, current address, telephone number, account number, amount of the debt, and a notation that Miller was an attorney, does not alone indicate the considered exercise of professional legal judgment. Miller I, 321 F.3d at 304. Subsequent to the Circuit's remand, and upon a review of the evidence adduced through discovery and at trial, this Court now concludes, as both a factual and legal matter, that the superficial level of review undertaken by Slamowitz and UCS was insufficient under the FDCPA.

The Seventh Circuit's decision in Nielson v. Dickerson, 307 F.3d 623 (7th Cir. 2002), presents the most instructive and analogous case for establishing the requirements of meaningful attorney review. On facts nearly identical to those presented here, the Seventh Circuit concluded that Dickerson, the defendant attorney, failed to conduct a sufficiently meaningful review of his

debt-collection matters. Id., 307 F.3d at 639. As discussed below, application of Nielson's

rationale to the facts and circumstances of the instant case compels the same outcome.

Dickerson, an attorney had, among other qualifications, more than 25-years experience in

debt-collection law; had acquired expertise in, and kept current on, FDCPA requirements;

maintained membership in several debt collection organizations; and conducted FDCPA training

for his staff. Id. Sued, as here, for the issuance of allegedly deceptive debt collection letters

under FDCPA §§ 1692e(3) and (10), Dickerson claimed that he and his firm did conduct

meaningful attorney review in compliance with the FDCPA, and that debt collection letters sent

to holders of GM Credit Cards were therefore not deceptive. Id. In articulating his multi-tiered

review procedures, Dickerson testified that he had (i) a general understanding of his client's

internal procedures; (ii) knew what steps the client had taken to collect on overdue accounts, and

how long those accounts had been delinquent before they were referred to him for collection;

(iii) reviewed the master contract governing GM Card accounts; (iv) looked at client data

containing the debtor's account number, name, address, account balance, and amount past due;

(v) checked the information provided to him for typographical errors in the data that could result

in erroneous issuance of debt collection letters; (vi) collaborated with the client to run a series of

automated and manual checks to weed out debtors who had previously received letters or

declared bankruptcy or lived in a state where collection procedures were prohibited; and (vii)

handled telephone calls and correspondence with debtors, which were then forwarded to the

client. Id. at 636-39.

On those facts, the Nielson court concluded that Dickerson's violation of §§ 1692e(3) and

(10) was "inescapable." Id. at 639. Although Dickerson was found to be more involved in the

process by which letters were sent to debtors than were his counterparts in other cases

(comparing, e.g., <u>Clomon</u>, where the defendant attorney had no knowledge of individual debt-collection matters), his involvement "fell short" of what was legally required. <u>Id.</u> at 638. The Court found that the review actually performed by Dickerson's law firm, even to the extent that it was performed by an attorney at one or more levels, did not call for the exercise of professional judgment as to the delinquency and validity of any individual cardholder's debt before the issuance of a letter to that debtor, nor was such judgment possible on the limited information provided by the client. <u>Id.</u> at 637. In sum, Dickerson's general practices and procedures "amounted to no more than a veneer of compliance with the FDCPA." <u>Id.</u> at 638.

    <u>Miller I</u> and <u>Nielson</u> thus establish that reviewing basic debtor information – the informational equivalent of "name, rank and serial number" – without more, is insufficient data on which to form a reasoned professional judgment as to the appropriateness of a collection action. <u>Miller I</u>, 321 F.3d at 305 (review of Miller's full name, social security number, current address, telephone number, account number, amount of the debt, and a notation that Miller was an attorney, did not, without more, establish the required level of review); <u>Nielson</u>, 307 F.3d at 636 (finding attorney could not have rendered the necessary judgment on client's limited information, which included only debtor's account number, name, address, account balance and amount past due). The holdings of these cases beg the question: what additional categories of information must an attorney review in order to establish a proper basis upon which to act? Given the variety of law firm policies and procedures, coupled with differences in long-standing client-attorney relationships, the answer to that question necessarily turns on a case-specific analysis. <u>Miller I</u>, 321 F.3d at 304. In this case, however, FDCPA compliance would at a minimum have required attorney Mitchell Slamowitz to review at least certain available data that he wholly ignored. Here, the available but unreviewed information included at least (a) Miller's

16

credit card agreement with Lord & Taylor and (b) Lord & Taylor's own files detailing their previous in-house debt-collection efforts. Slamowitz neither requested nor received either before authorizing issuance of Miller's debt-collection letter or prior to commencing legal action.

Reference to Nielson and Miller I again indicates the need to review underlying debtor information such as the underlying contract and/or client file.[7] The prudence of doing so is demonstrable here. In testifying that he had neither reviewed the operative credit card agreement nor sought to obtain it; Slamowitz went on to concede his ignorance of two pivotal, although easily ascertainable facts: that Miller's credit card agreement was governed by Ohio law, and that Ohio law precluded UCS's claim for attorneys' fees. Although neither error goes to the validity of Miller's alleged debt, Slamowitz's failure to inquire into such core issues implicates basic concerns of attorney competence and speaks directly to an appreciable lack of professional care in preparing the matter for debt-collection and/or legal action.[8] This Court thus concludes that, in cases such as here, where an attorney commences suit in so uninformed a manner that he is ignorant even as to what law governs his suit, it cannot be said that he has undertaken a level of review sufficient to satisfy even the most general requirements applicable to attorney conduct, let alone the more focused review requirements established by the FDCPA.

Separately, Slamowitz's failure to obtain and review Lord & Taylor's client file provides an adequate and independent basis for FDCPA liability. Indeed, it has been suggested that only in the most unlikely circumstances can an attorney exercise considered judgment without review

---

[7]  Nielson, 307 F.3d at 639 (attorney's familiarity with credit card agreement found not to be sufficient, even when coupled with other data); Miller I, 321 F.3d at 304 (contemplating some level of familiarity with credit card agreement, though not requiring express review in each case).

[8]  The Second Circuit determined that any FDCPA claims related to UCS claim for attorneys' fees had not timely been advanced and were effectively waived. Miller I, 321 F.3d at 307.

of the debt information contained in the actual client file. See Miller I, 321 F.3d at 304.[9]

Although, the need for debt-collection attorneys to obtain debtor files from their clients also was

examined in Nielson, 307 F.3d at 636 (noting that the mere electronic transmission of the client

bank's basic information on the debtor, as opposed to the physical delivery of their actual debtor

file, suggested that attorney had less than adequate information), the Court need look no further

than attorney Abramson's actions in this case for a comparison model of appropriate attorney

effort:

> **Question:** ... At the time you made the determination to send the letter, did you have in your possession any hard-copied documents pertaining to Mr. Miller's file?
>
> **Answer:** I did. I had a number of things. I had the credit card terms and conditions that applied to Mr. Miller's account. I also had a fairly extensive referral information package sent by our client [Lord & Taylor].
> So before I sent the collection letter out I had the opportunity to review that Mr. Miller had disputed the amount. He had offered a reduced settlement on the account. I reviewed that my client had rejected that settlement. I had reviewed that Mr. Miller subsequently sent a cease and desist to them demanding that they not contact him any further. And the next note that my client had sent is that as a result of that they had to forward it to litigation attorneys because Mr. Miller had barred Lord & Taylor from contacting him any further with respect to the account; so they didn't have any other remedies.

---

[9]      In Miller I, the Second Circuit suggested that the data contained in the complete client file (or, alternatively, some proxy for such information) is typically necessary for a proper FDCPA review:

> While plaintiff asks us to declare a minimum standard requiring attorneys to review a copy of the contract, a credit report, and a full payment history or statement of account to satisfy Clomon's requirement of meaningful attorney involvement, we decline to do so on the record here, in part because there may be circumstances where, following discovery, it becomes clear that the attorney's familiarity with the client's contracts and practices would negate the need to review some if not all of the documents plaintiff seeks to require. For example, an attorney and client could have established a practice whereby the attorney has specified that the entire payment history is to be included in the summary provided by a client. On this undeveloped record, however it suffices for us to hold that merely being told by a client that a debt is overdue is not enough. Id. at 304. (emphasis added).

Miller I, 321 F.3d at 304.

18

I was also aware of all of the fundamental details. I mean, Mr. Miller's name, his address, his Social Security number, his date of birth. I knew how much money was owed on the account. I knew when it charged off on their books and records... .

**** 

Getting back to the other information, I had a lot of additional information. I knew that Mr. Miller had not had any nonsufficient funds checks. So he didn't write any bad checks to them. I was aware of that at the time of the referral. And I had this and was aware of that at the time of the referral. And I had his and was aware of his home phone number, his work phone number. Off of memory, I may have known his occupation as an attorney. I would have to look at the referral for that, but that often comes to us as well.

But <u>critically</u> I had the <u>actual</u> information that Lord & Taylor kept in their computer systems. It is unaltered information, and it was the same exact information that they used to create billing statements. That was sent directly from Lord & Taylor to my office. No one else touched it. No one altered it. No one changed it. ... .

And after reviewing the customer service notes and all of the information that I had just explained to you, I made a considered professional judgment that it was appropriate to merely send a validation letter to Mr. Miller. (emphasis supplied).

In sum, Abramson testified credibly that his own files at Wolpoff contained at least the following information not available to UCS: (1) the date Miller's account was last charged; (2) the "charge off" date; (3) a synopsis of recent customer service notes regarding the Lord & Taylor's efforts to resolve Miller's account, evidencing Miller's settlement and reduced payment offer, and Lord & Taylor's refusal. See also Miller I, 321 F.3d 304 n.3. Further, Lord & Taylor's hard-copy file, to which Abramson had access, but which Slamowitz did not, contained all of the above, plus: (1) complete credit payment history; and (2) correspondence with Miller, in which Miller disputed the debt. Id.

In detailing the specific utility of the above information, the Court is well-satisfied that Abramson did, in fact, diligently review the totality of Miller's records. In regarding

Abramson's testimony, the Court was particularly impressed by Abramson's characterization of such information as having been critical to reaching a considered, professional judgment as to the propriety of debt-collection action in this case. In marked contradistinction, the Court finds incredible Slamowitz's identical claim to have reached an independent legal judgment without the benefit of or independent reference to the very material Abramson found so indispensible. Indeed, this Court finds Slamowitz's testimony overall to be lacking in credibility based on his lack of facility in answering basic questions about his practice and the Miller file, his demeanor on the witness stand, and his interest in the outcome of these proceedings. He claimed to remember the Miller file, but only because the debtor shared a name with others quite well known. His familiarity with his own firm's files, both paper and electronic, was woefully inadequate for a man who professed to be an experienced and able collections attorney, confident in the systems and processes in place that guided his work. Thus, given the nature of Slamowitz's testimony coupled with the undisputed, credible evidence establishing Slamowitz's failure to personally review any of the relevant underlying data, the Court finds that UCS did not conduct a sufficient attorney review for FDCPA purposes.

Moreover, that UCS and Slamowitz failed to comply with the FDCPA's requirements in this case is further supported by evidence regarding the practices within UCS including the daily and monthly volume of matters handled by UCS partners Cohen and Slamowitz, as well as the manner in which UCS personnel documented their collection activities. First, by their own testimony, Cohen and Slamowitz conceded the issuance of no fewer than 211 debt-collection letters on July 18th alone, and more than 3,000 such letters in the month of July, 2000. Compare Clomon, 988 F.2d at 1321; Boyd, 275 F.3d at 648. Additionally, UCS's own computer records reflect accurate, contemporaneous entries by those non-attorney personnel at UCS who reviewed

the Miller file and authorized the printing of the summons and complaint.[10] The records also

confirm Slamowitz's complete lack of involvement with Miller's file until November 30, 2000,

well after the Miller litigation began. Although Slamowitz and Cohen suggested that the lack of

a timely notation regarding Slamowitz's involvement with the Miller file is likely attributable to

a combination of Slamowitz's absent-mindedness and the lack of any industry standard for

record keeping as of 2000, these explanations are wholly self-serving and without support. The

volume of business at UCS, coupled with practices followed in the Miller matter, supports the

conclusion that debt collection letters and litigation documents were regularly mass-produced at

UCS by non-lawyers at the push of a button. In sum, a preponderance of the credible evidence

presented at trial demonstrates UCS's lack of any meaningful attorney review of the Miller file,

despite the contrary implications of UCS's July 18th debt-collection letter and the subsequent

court filings. As such, UCS is liable for misrepresentations in violation of FDCPA§ 1692e.

## II

## Reasonable Reliance Upon Another's Prior Review

Despite Slamowitz's lack of meaningful, independent review, UCS seeks to avoid

FDCPA liability, claiming that prior review of Miller's file by others, including Lord & Taylor

and Wolpoff, established a reasonable, reliable basis for UCS's debt-collection efforts, thus

---

[10]     As to the importance of notating electronic debt-collection files upon an attorney review, Abramson testified in pertinent part as follows:

Q: Going back to your testimony ... you reviewed Mr. Miller's file. I believe that you said that you personally reviewed it and you put your initials in your notes?
A: Correct. That's my entry on February 23rd. In our system I was the one that – the only one who had the security to get into our computer system and to enter the notes in there that I reviewed the file and then subsequently sent a letter.
Q: So is that the policy and practice in your firm, that when a lawyer reviews a file there is a notation made and the lawyer is identified?
A: Well, I think for the year 2000, I think it would be fair to say critical events – what we believed were the critical events would have been notated by the lawyer at that time ...
Q: Is that your testimony, that an attorney review of a file is a critical event?
A: Yes, for the most part. ...

obviating the need for further review to comply with the requisites of the FDCPA. As a corollary, in arguing that it was properly entitled to rely upon such prior review, UCS argues that its own overall practices, policies, and procedures, when coupled with its long-standing relationships with both Lord & Taylor and Wolpoff, rendered such reliance both reasonable and FDCPA compliant. UCS's arguments are unpersuasive.

For the reasons discussed immediately below, this Court finds that UCS attorneys were not absolved of their professional obligations to review independently Miller's debt-matter. In any event, this Court further concludes that regardless of UCS's practices, policies, procedures or its various relationships with clients and co-counsel, the weight of the credible evidence establishes that Slamowitz did not have the requisite familiarity with his predecessor reviewers necessary to support any degree of reasonable reliance on their prior review of Miller's case.

In exercising independent professional judgment to issue a collection letter, an attorney may, to some extent, reasonably rely upon and consider a prior review and/or opinion from reputable and reliable attorneys, clients and paralegals. Miller II, 471 F. Supp. 2d at 250-51 (noting that, "[A]ttorneys sending debt collection letters are entitled to rely, at least to some degree, on the judgments of others."). Where reasonable, such information may inform an attorney's decision, and therefore limit the review necessary to reach an adequate professional judgment concerning an individual debtor's case. Miller I, 321 F.3d at 304; Young, 1997 WL 280508, at *6. But, as our predecessor Court previously determined, such reliance does not wholly obviate the need for independent inquiry. Miller II, 471 F. Supp. 2d at 251. Even prior review of an individual debtor's file by another, including co-counsel, is no substitute for an independent review by the attorney signing and issuing that debt collection letter. Miller II, 471 F. Supp. 2d at 251 (citing Val-Land Farms, Inc. v. Third Nat'l Bank in Knoxville, 937 F.2d

22

1110, 1117 (6th Cir. 1991) (Rule 11 case holding that an attorney may not delegate his professional responsibility to co-counsel)).

As in the analogous Rule 11 context, an attorney responsible for issuing and executing a legal document "must make a reasonable inquiry personally." Garr v. U.S. Healthcare, Inc., 22 F.3d 1274, 1280 (3d Cir. 1994) (emphasis added). While this requirement may result in duplicative attorney review, the advantages are manifest: where one attorney may find such action warranted by law, another, upon inspection of the same materials, may come to a contrary result. Id. Thus, in FDCPA cases, the attorney bearing the conclusive responsibility for issuing collection letters "may not simply substitute the judgment of that other party for his or her own." Miller II, 471 F. Supp. 2d at 251. As stated above, the evidence presented at trial demonstrated Slamowitz's lack of engagement with Miller's file. Having failed to undertake any independent review, Slamowitz's references to Lord & Taylor and Wolpoff's prior efforts is a naked attempt to substitute their judgment for his own in derogation of his professional duties and his obligations under the FDCPA.

Even assuming, arguendo, that Slamowitz had performed something more than a cursory examination of Miller's file, he failed to demonstrate familiarity with either Lord & Taylor or Wolpoff's review procedures sufficient to permit reasonable reliance on their previous efforts. Moreover, the fact that UCS itself employed generalized review procedures, as UCS partner Cohen testified, in no way remedies Slamowitz's failures. As Chief Judge Dearie determined in Miller II, to be afforded the benefit of reasonable reliance, indices of reliability must be shown: e.g., a party's history of past reliability, reputational quality, use of rigorous practices and procedures, etc. Id. For FDCPA purposes, an attorney claiming reasonable reliance must also show that he or she was aware of those factors at the time of his or her review and at the time

23

that the collection letters were actually sent. Id. An after-the-fact investigation into the reliability of another's work will not suffice. Id. Similarly, it is not sufficient to claim, after the fact, that the other party's procedures were adequate, or that they reached the correct result. Id. (citing Vista Mfg. Inc. v. Trac-4 Inc., 131 F.R.D. 134, 138 (N.D. Ind. 1990). To paraphrase the court in Garr v. U.S. Healthcare, supra, a shot in the dark is no less sanctionable because it happens to hit the mark. Garr, 22 F.3d at 1279 (quoting Vista Mfg., 131 F.R.D. at 138). The credible trial evidence demonstrated Slamowitz's lack of adequately familiarity with Lord & Taylor's or Wolpoff's review procedures at the time he authorized debt-collection action on Miller's file. With respect to Lord & Taylor, Slamowitz testified unequivocally regarding his lack of knowledge as to its in-house debt-collection procedures. With respect to Wolpoff, Slamowitz testified that he visited Wolpoff's Maryland offices prior to July 2000 and that, at that time, he was generally "impressed" with Wolpoff's practices. Nonetheless, Slamowitz failed to recall with any degree of specificity his understanding of those practices. Slamowitz's trial testimony on these topics mirrored statements made in his pre-trial deposition that Chief Judge Dearie, in Miller II, properly regarded with skepticism:

> ... [T]his testimony indicates only that at the time he was deposed, Slamowitz knew that [Wolpoff] was "a very thorough firm"; that it had "gone down there and covered" its client's "procedures, etc." ... Although Slamowitz knew [Wolpoff] was "thorough," he does not claim to have known anything about the process by which it reviewed plaintiff's case .... Nor does Slamowitz claim any specific knowledge of the manner in which [Wolpoff] "covered" Lord & Taylor's "procedures." Finally, his testimony does not indicate what, if anything, he knew about [Wolpoff's] procedures, or its handling of plaintiff's file, on the day he signed the letter to plaintiff.

Miller II, 471 F. Supp. 2d at 252. In sum, the evidence presented at trial yields no additional information that would support Slamowitz's reasonable reliance on either Lord & Taylor's or Wolpoff's previous debt-collection review in Miller's case.

Finally, none of the generalized review procedures UCS employed suffice to overcome Slamowitz's failure to undertake a review of Miller's file. In evaluating the sufficiency of attorney review, the Court's inquiry focuses not upon general procedure, but upon the sufficiency of the attorney's independent review of a *particular* case prior to the issuance of a debt collection letter. Indeed, as evident in <u>Nielson,</u> a law firm may employ a robust set of overarching procedures, but an attorney's failure to conduct an independent review of the particular circumstances of an individual debt collection letter will still doom the process. <u>Id.</u>; <u>see also</u> <u>Young v. Citicorp Retail Srvcs., Inc.,</u> No. 95-cv-1504 (AHN), 1997 WL 280508, at *6 (D. Conn. May 19, 1997) (computerized review of accounts cannot substitute for an attorney's professional judgment, even where the attorney designed the criteria for the computerized review and reviewed the mailing list before issuance of letters).

Thus, the FDCPA establishes a duty of reasonable inquiry on the attorney signing the debt collection letter. <u>See</u> <u>Miller II,</u> 471 F. Supp. 2d at 251 (analogizing from <u>Unioil, Inc. v. Hack Oil, Inc.,</u> 809 F.2d 548, 558 (9th Cir. 1986)). The signing attorney alone is responsible for exercising professional judgment concerning the existence of a valid debt before issuing a debt collection letter. <u>Goins,</u> 367 F. Supp. 2d at 244. In so doing, independent judgment cannot be surrendered in mere reliance upon generalized law firm or client practices and procedures. <u>Id.</u>

## CONCLUSION

For the foregoing reasons, this Court concludes that Defendant UCS failed to undertake a meaningful review of Plaintiff's debt-collection matter and is therefore liable for misrepresentations in violation of FDCPA § 1692e. An inquest on damages will be had by separate proceeding.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2009

ROSLYNN R. MAUSKOPF
United States District Judge