UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
ARTHUR MILLER,

                  Plaintiff,

      - against -

UPTON, COHEN & SLAMOWITZ,

                  Defendant.
--------------------------------------------------------X

**MEMORANDUM AND ORDER**
01-CV-1126 (RRM)(RML)

**ROSLYNN R. MAUSKOPF, United States District Judge.**

Attorneys for Plaintiff have petitioned for the award of attorney's fees and costs, on the entry of judgment in favor of Plaintiff and as against Defendant in the amount of $1,000 in statutory damages pursuant to 15 U.S.C. § 1692k, following a bench trial in which Defendant was found liable for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e(3) and (10). For the reasons that follow, the petitions are GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND AND HISTORY OF THE LITIGATION

The facts of this matter are fully set forth in the decision of the Second Circuit in *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 298 (2d Cir. 2003). Recited here is a limited overview of the relevant procedural history to provide context for the instant fee application.

Plaintiff filed his complaint on February 23, 2001 as a putative class action. The complaint alleged that Defendants Wolpoff & Abramson, L.L.P. (WA), Upton, Cohen & Slamowitz (UCS), and National Attorney Network, Inc. (NAN), "individually and as joint-venturers and co-conspirators, violated the FDCPA (1) by sending debt collection letters on attorney letterhead without meaningful review by any attorney of the circumstances surrounding

1

plaintiff's alleged debt, (2) by attempting to collect attorney's fees that were to be shared with NAN as a referral fee in violation of state professional ethics rules, and (3) by mailing a letter that would confuse the 'least sophisticated consumer' as to his or her rights." *Id.* at 298.

Brian Bromberg, a New York-based consumer debt attorney, was Plaintiff's attorney of record at the inception of the case. [1] (Bromberg Aff. (Doc 225-2) at 16.) Chicago-based consumer debt attorneys Lance Raphael of the Consumer Advocacy Center, P.C., ("CAC") and Christopher Langone, in his own private practice, did not enter appearances until later in the litigation, though their billing entries reflect services rendered going back to the filing of the complaint. (*See* Raphael Aff. (Doc No 225-3) at 61; Langone Aff. (Doc No 225-5) at 6; *see also* Motion for Langone to appear *pro hac vice*, Nov. 15, 2001; Motion for Raphael to appear *pro hac vice*, May 29, 2003.)

Defendants filed for summary judgment in June 2001, and (then-District) Judge Raggi granted the motion, dismissing the complaint in its entirety. (Doc. No. 56.) Plaintiff appealed the dismissal, and the Second Circuit vacated in part and affirmed in part. *Miller*, 321 F.3d at 311; *see* Mandate from USCA (Doc. No. 98), May 8, 2003. The Circuit held that summary judgment was premature, and Plaintiff was entitled to further discovery on the issue whether WA and UCS had conducted "meaningful attorney review" of Plaintiff's alleged debt. *Miller*, 321 F.3d at 311. The Circuit affirmed dismissal of all of Plaintiff's claims against NAN, finding that the sharing of fees with NAN, a non-attorney, did not violate the FDCPA, and dismissed the majority of claims against WA and UCS, finding that various letters sent were not confusing to the "least sophisticated consumer." *Id.* The case was remanded for further discovery in May

---

[1] Bromberg was employed by two firms during the pendency of this litigation, the Law Offices of Peter Marc Stern, and his own firm, the Bromberg Law Office, P.C. As discussed more fully, *infra*, Bromberg also billed some of his own time while working in his own firm through the Consumer Advocacy Center, his co-counsel's firm.

2003 on the sole remaining claims against WA and UCS relating to meaningful attorney review. *Id.*

The case remained in discovery before Magistrate Judge Levy from May 2003 until March 9, 2006. (*See* Order of Magistrate Judge Levy, Oct. 10, 2007.) Discovery was protracted and, at times, contentious. Both sides repeatedly requested sanctions going back to September 2003. (Doc Nos. 110, 112.) The deposition of Slamowitz was particularly antagonistic, involving multiple motions and a lost transcript. (*See* Doc Nos. 123–127, 147–148.) Plaintiff unsuccessfully attempted, both before the Magistrate Judge and on appeal to the District Judge, to compel production of Defendant's unredacted computer records, in the form of still images of screen output, following approval of the joint pre-trial order. (*See* Order of Magistrate Judge Levy, Oct. 10, 2007 (denying Plaintiff's motion to compel); *Miller v. Wolpoff & Abramson, LLP*, No. 01-CV-1126 (RJD)(RML), 2007 WL 3375117, at *1 (E.D.N.Y. Nov. 9, 2007) (Chief District Judge Dearie upholding Magistrate Judge Levy's denial of Plaintiff's motion to compel).

Plaintiff and WA reached a settlement agreement in principle on May 23, 2005, and the settlement was consummated on December 13, 2005. (*See* Order of Magistrate Judge Levy, May 23, 2005; Order of Magistrate Judge Levy, Dec. 13, 2005; Consent J. and Order of Dismissal (Doc No 162) at 4 (dismissing claim against WA).) In that Consent Judgment, Plaintiff "acknowledge[d] that . . . no violations of the [FDCPA] were found in the handling of his account by [WA]." (Consent J. 4.)

In August 2006, the sole remaining defendant, UCS, moved for summary judgment. (Doc. No. 171.) Chief Judge Dearie denied the motion in January of 2007, finding issues of fact surrounding whether UCS conducted a meaningful attorney review, either by relying on WA's own review of Plaintiff's file, or whether UCS' own review, in and of itself, met this standard.

3

*See Miller v. Wolpoff & Abramson, L.L.P.*, 471 F. Supp. 2d 243, 253, 257 (E.D.N.Y. 2007). The case was re-committed to Magistrate Judge Levy for remaining pre-trial proceedings. Though filed as a putative class action, no motion for certification was ever made, and while still available, class claims and relief were abandoned by the time the pre-trial order was approved in October 2007. (*See* Order of Magistrate Judge Levy, Oct. 2, 2007.)

A bench trial was held before this Court in June 2008. Plaintiff was represented by Mr. Bromberg, together with another Chicago-based consumer attorney, Dmitri Feofanov, who entered an appearance literally on the eve of trial because another attorney with whom Bromberg was to try the case was not available. This Court found for Plaintiff because UCS "failed to undertake a meaningful review of Plaintiff's debt-collection matter." *Miller v. Upton, Cohen & Slamowitz*, 687 F. Supp. 2d 86, 103 (E.D.N.Y. 2009). Plaintiff was awarded the statutory maximum individual recovery of $1,000.

## II.     THE FEE APPLICATION

### A.  The Original and Revised Applications

Initially, Plaintiff sought reimbursement of $431,893.00 in fees from five separate law firms, representing the billing of seven attorneys and various support staff. (*See* Pl. Mot. for Att'y Fees (Doc. No. 225) ("Original Application"), Bromberg Aff. ¶ 10; Raphael Aff. ¶ 17; Feofanov Aff. ¶ 7; Langone Aff. ¶ 12.) Defendant submitted a lengthy and comprehensive opposition (*See* Def. Response in Opp'n (Doc. No. 226) ("Defendant's Opposition")), which contained significant, detailed objections to large portions of the Original Application. In fact, Defendant engaged in a line-by-line analysis of Plaintiff's voluminous billing records, identifying with color codes and other notations hundreds of individual billing entries that Defendants alleged should be eliminated on such grounds as vagueness, duplicative and

4

excessive billing, lack of success, and others.  In addition to eliminating these fees entirely, Defendant argued for an additional across-the-board cut of 50 percent.  Based on its calculations, Defendant maintained that the total fee award should be reduced to $64,692.43.  (*Id.* at 25.)

In a joint reply to the opposition filed by all of the attorneys seeking fees (Pl. Reply in Supp. (Doc. No. 230) ("Revised Application")), Plaintiff has agreed to reduce his original request somewhat, eliminating altogether many of the individual billing entries originally submitted, and reducing others by half.  As discussed more fully below, Plaintiff also reduced the billing rate for one attorney, Lance Raphael, from $550 per hour, to $350 per hour, a reduction that, in and of itself, accounts for approximately 44 percent of the difference between the Original and Revised Applications.  The reduced fees requested in the Revised Application, again for the same attorneys and staff as in the Original Application, now total $326,012.00.

The chart below contains a comparison of the Original and Revised Applications, broken down by the total lodestar figures requested for each law firm:

| Law Firm | Fees Sought | | |
|---|---|---|---|
| | Original Application | Revised Application | Difference |
| Peter Marc Stern[2] | $38,010.00 | $20,562.50 | $17,447.50 |
| Bromberg Law Office[3] | $94,912.50 | $81,595.00 | $13,317.50 |
| Consumer Advocacy Center, P.C.[4] | $184,208.00 | $123,422.00 | $60,786.00 |
| Langone[5] | $95,722.50 | $81,637.50 | $14,085.00 |
| Feofanov | $19,040.00 | $18,795.00 | $245.00 |
| **TOTAL SOUGHT** | $431,893.00 | $326,012.00 | $105,881.00 |

---

[2] The records of Peter Marc Stern do not indicate who performed any of the services.  The Court presumes the fees sought are for work done wholly by Bromberg, based on Bromberg's affidavit in support and the billing rate of $350 per hour.

[3] The Bromberg firm includes submissions of fees for Bromberg, associate Aditi Dita Nag, law student Kenneth Hammer, and firm paralegals.

[4] The Consumer Advocacy Center includes submissions of fees for Bromberg, Raphael, Stacy Bardo, an associate who, in 2005, became a partner, and firm paralegals.

[5] Langone includes submissions of time for Langone, associates Joel Dabich and Craig Frisch, and firm paralegals.

On reply, none of the attorneys explain how or why entries were eliminated, or why others were chosen for reduction. Nonetheless, Plaintiff agrees that the parties' dispute has now been narrowed to those fees sought in the Revised Application. As such, the Court will use as the basis for its review those fees sought in the Revised Application.[6]

### B. Applicable Law

The FDCPA provides for the recovery of reasonable attorney's fees and costs by successful litigants. *See* 15 U.S.C. § 1692k(a)(3) (2006) (permitting recovery of, "in the case of any successful action to enforce [FDCPA] liability, the costs of the action, together with a reasonable attorney's fee as determined by the court"); *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 28 (2d Cir. 1989) (citing *Emanuel v. Am. Credit Exch.*, 870 F.2d 805, 809 (2d Cir. 1989)). The starting point for determining a reasonable fee is the determination of the "lodestar," or, as it is now characterized in this Circuit, the "presumptively reasonable fee," by multiplying the number of hours reasonably expended by the attorney on behalf of a successful client by a reasonable hourly rate for that attorney. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997); *Overcash v. United Abstract Grp., Inc.*, 549 F. Supp. 2d 193, 197 (N.D.N.Y.2008) (quoting *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 141 (2d Cir. 2007)); *King v. JCS Enters., Inc.*, 325 F. Supp. 2d 162, 166 (E.D.N.Y.2004) (citing *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004) and *Quarantino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)).

---

[6] Although the Court will use the Revised Application to form the basis of the attorney's lodestar request, the Court will consider all of the affirmations, memoranda of law, and other submissions provided by all attorneys in support of both the Original and Revised Applications. This includes not only all documentation submitted in support of the Original Application, Defendant's Opposition, and the Revised Application (which constitutes Plaintiff's Reply), but all supplemental memoranda and letter briefs submitted by the parties <u>after</u> the filing of Plaintiff's Reply as well.

Rather than relying dogmatically on claimed hours and rates, a court considering a fee application must determine "what a reasonable, paying client would be willing to pay" in light of all the relevant circumstances of the case. *Arbor Hill*, 522 F.3d at 184.  District courts have broad discretion, using " 'their experience with the case, as well as their experience with the practice of law, to assess the reasonableness' " of each component of a fee award. *Fox Indus., Inc. v. Gurovich*, No. 03-CV-5166 (TCP)(WDW), 2005 WL 2305002, at *2 (E.D.N.Y. Sept. 21, 2005) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992)).  In so doing, courts should take into account the so-called *Johnson* factors.[7]  *Johnson v. Ga. Highway Express*, 488 F.2d 714, 717–19 (5th Cir. 1974); *see U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 415 (2d Cir. 1989) (adopting *Johnson* factor analysis); *Arbor Hill*, 522 F.3d at 190.

Once it has determined the presumptively reasonable fee, a district court has further discretion to fashion a reasonable award of attorney's fees by adjusting the fee upward or downward to reflect the circumstances of the case.  *U.S. Football League*, 887 F.2d at 413; *Rivera v. Corporate Receivables, Inc.*, 540 F. Supp. 2d at 329, 337 (D. Conn. 2008); *Sparkman v. Zwicker & Assocs., P. C.*, 04-CV-1143 (NG)(KAM), 2006 WL 463939, at *2 (E.D.N.Y. Feb. 27, 2006) ("Calculation of the lodestar amount is only the first step in determining a reasonable award of attorney's fees.").  Downward adjustments in the presumptively reasonable fee may take the form of percentage cuts "across-the-board," or the elimination of specific entries. *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998); *accord Saunders v. City of N.Y.*, 07-CV-830 (SAS), 2009 WL 4729948, at *5 (S.D.N.Y. Dec. 9, 2009).

---

[7] These factors are: (1) time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the 'undesirability' of the case; (11) the nature and length of the profession relationship with the client; and (12) awards in similar cases.

The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Cho v. Koam Med. Servs. P.C .*, 524 F. Supp. 2d 202, 209 (E.D.N.Y. 2007) ("The party seeking the award bears 'the burden of documenting the hours reasonably spent by counsel.' " (quoting *King v. STL Consulting, LLC*, No. 05-CV-2719 (SJ), 2006 WL 3335115, at *6 (E.D.N.Y. Oct. 3, 2006))). The burden is on the party seeking a downward adjustment to support that request. *U.S. Football League*, 887 F.2d at 413.

### C.  Summary of the Court's Analysis

This Court has spent a considerable amount of time thoroughly examining both the Original and Revised Fee Applications, as well as the voluminous billing records, affirmations and exhibits attached thereto, and all other submissions. Moreover, having heard the evidence at a bench trial in this matter, and having reviewed the entire record both in the District Court and on appeal to the Second Circuit, this Court is fully familiar with the litigation in its entirety, including the record on appeal and those portions of the District Court litigation presided over by then-District Judge Rena Raggi and now Chief District Judge Raymond J. Dearie.

As discussed fully below, the Court has determined the presumptively reasonable fee by calculating a proper lodestar and evaluating the *Johnson* factors, and then has, in the proper exercise of its discretion, considered the propriety of an additional downward adjustment for, among others, the reasons advocated by Defendant. Notwithstanding the reductions made by Plaintiff in his Revised Application, which, in large part are attributable to the significant reduction in the hourly rate of one of the attorneys seeking fees, the Court finds that a further reduction to the fees sought in Plaintiff's Revised Application is wholly warranted, to include a reduction in billing rates for the attorneys and staff, as well as an across-the-board reduction of

30 percent, bringing the total award of fees to $168,701.58.  As such, Plaintiff's motion for attorney's fees is GRANTED IN PART and DENIED IN PART.

## III.   DISCUSSION

### A.  Reasonable Hourly Rate

#### a.  Applicable Law

The Second Circuit has held that courts are to award the presumptively reasonable fee, that is, the fee that would be paid by a reasonable, paying client in the relevant community. *See Arbor Hill*, 522 F.3d at 191–93.  District courts are to "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Arbor Hill*, 522 F.3d at 190.  The court "may also rely on its own knowledge of hourly rates charged in private firms to determine what is reasonable in the relevant community." *Nike, Inc. v. Top Brand Co.*, No. 00-CV-8179, 2006 WL 2946472, at *4 (S.D.N.Y. Feb. 24, 2006) (citing *Miele v. N.Y. State Teamsters Conference Pension & Ret. Fund*, 831 F.2d 407, 409 (2d Cir. 1987)).  A reasonable fee "should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.' " *Luciano*, 109 F.3d at 115 (citing *Blum v. Stenson*, 465 U.S. 886, at 896 n. 11).[8]

"It is well-established that the 'prevailing community' the district court should consider is 'the district in which the court sits.' " *Luciano*, 109 F.3d at 115 (quoting *Polk v. N.Y.S. Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir.1983)).  Only "exceptional circumstances" justify deviating from the rule that the relevant community is the district in which the action lies. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 97 (2d Cir. 2004).

_____

[8] *See Orchano v. Advanced Recovery, Inc.*, 107 F.3d 94, 98 (2d Cir. 1997) ("district court must 'determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order' " (quoting *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992) (Posner, J.))); *Cohen v. W. Haven Bd. of Police Comm'rs*, 638 F.2d 496, 506 (2d Cir. 1980) (court should look to "fees that would be charged for similar work by attorneys of like skill in the area").

### b.  Skill and Experience of the Attorneys

The attorneys involved in this matter all specialize in consumer debt cases and class

actions, and each has particular expertise in litigating cases under the FDCPA.  Brian Bromberg

graduated from Brooklyn Law School in 1991 and has been admitted to practice law in New

York since 1992.  (Original Application, Bromberg Aff. (Doc. No. 225-2), ¶¶ 14–15.)  From

1991 until 2001, Bromberg was an associate with the Law Office of Peter Marc Stern.  (*Id.* at

¶ 17.)  Bromberg is now the principal of Bromberg Law Office, P.C., a firm he opened in 2001,

focusing on consumer law.  (*Id.* at ¶ 18.)  Bromberg is a member of various professional

organizations and committees, including the Civil Courts Committee of the Federal Bar Council,

and the Association of the Bar of the City of New York.  (*Id.* at ¶¶ 20, 27.)  Aditi Diti Nag is an

associate with Bromberg Law Office, P.C.[9]  Nag, a Syracuse University College of Law

graduate, has been admitted to practice in New York since 2008.  (*Id.* at ¶ 9.)  Kenneth Hammer

worked for Bromberg Law Office, P.C. as a summer associate while a student attending

Brooklyn Law School.  (*Id.*)  Bromberg has been involved in this matter as attorney of record

from its inception.

Lance Raphael has been admitted to practice in Illinois since 1993, the same year in

which he graduated from the John Marshall School of Law.  (Original Application, Raphael Aff.

(Doc. No. 225-3), ¶ 1.)  Between 1993 and 1998, Raphael worked for two law firms: Teller,

Levit, and Silvertrust, and Horwitz, Horwitz & Associates.  (*Id.* at ¶ 8.)  Raphael is a principal of

CAC, a law firm he founded in 1999 focusing on consumer law.  (*Id.* at ¶ 9.)  Raphael is a

member of various professional organizations, including the National Association of Consumer

---

[9] While Bromberg asserts that he has removed billing entries related to Nag (Doc. No. 230, p.10), the majority still
remain.

Advocates. (*Id.* at ¶ 10.) He has worked on this litigation from its inception, and entered a notice of appearance in this matter in May 2003.

Stacy Bardo graduated from the Loyola University Chicago School of Law in 2000, and was admitted to practice law in Illinois in the same year. (Original Application, Raphael Aff., Ex. 3 (Doc. No. 225-3), ¶¶ 1, 3.) She has worked for CAC since 2000, and she was made a partner there in 2005. (*Id.* at ¶¶ 3, 5.) Her practice focuses on consumer rights. (*Id.* at ¶ 5.) Bardo is a member of various professional organizations, including the Illinois State Bar Association, the Chicago Bar Association, and the National Association of Consumer Advocates. (*Id.* at ¶¶ 7, 8.) She is not an attorney of record in this case, but has worked on the litigation from its inception.

Christopher Langone graduated from Northwestern University Law School in 1992, and was admitted to practice law in Illinois that same year. (Original Application, Langone Aff. (Doc. 225-5), ¶ 1.) From 1992 until 1995, Langone was an associate with Seyfarth, Shaw, Fairweather & Geraldson, where he defended consumer class action cases. (*Id.*) In 1995, Langone founded his law firm, where he focused on consumer rights. (*Id.* at ¶ 2.) Joel Dabisch, Craig Frisch and Mark Lavery were associates with Langone's firm. Langone left the practice of law in 2007 to enroll in a PhD program at Cornell University. (*Id.* at ¶ 4.) Langone entered a notice of appearance in this action on November 15, 2001 and was the attorney primarily responsible for briefing and arguing the first, wholly unsuccessful summary judgment motion, and briefing and successfully arguing the appeal in the Second Circuit. His work in the matter ended in 2002.

Dmitry Feofanov was admitted to practice law in Illinois in 1994, after graduating from the Chicago-Kent College of Law earlier that year. (Original Application, Feofanov Aff. (Doc.

11

No. 225-4), ¶¶ 2–3.) Feofanov was a clerk in the Iowa Supreme Court from 1994 to 1995. (*Id.* at ¶ 3.) From 1995 until 1996, Feofanov was a research attorney in the Illinois Appellate Court. (*Id.*) Feofanov then worked for the law firm Brooks, Adams and Tarulis from 1996 until 2002, when he left as a partner. (*Id.*) Feofanov is the founder and principal of Chicagolemonlaw.com, where he focuses on consumer law. (*Id.*) He appeared in this matter quite late, on the eve of trial in May 2008, and performed work solely over the course of the two-day bench trial.

### c.  Hourly rates in the Revised Application

Notwithstanding the fact that the Revised Application spans a period of eight years, the following hourly rates are used for all hours billed between 2001 and 2009:  Bromberg, Raphael, Langone and Feofanov, currently partners, all bill at $350 per hour; Bardo, Dabisch and Frisch, associates, bill at $300 per hour; Nag, Bromberg's associate, bills at $175 per hour; Hammer, a law student working for Bromberg, bills at $115 per hour; and paralegals at CAC bill at $90, while Langone's paralegals bill at $150.  The Court finds that adjustments to these rates are in order, based on the prevailing rate in this community for attorneys and staff of similar experience for similar services, and the spread of years over which the work was done.

### d.  Current and Historic Eastern District of New York hourly rates

The attorneys here seek fees for an eight-year period spanning 2001–2009, and use current hourly rates in calculating their lodestar request.  However, during this period, hourly rates in this district have, not surprisingly, increased.  Looking in reverse chronological order, recent rates of $200 to $350 per hour for partners, $200 to $250 per hour for senior associates, $100 to $150 for junior associates, and $70 to $100 per hour for paralegals, have been considered reasonable in the Eastern District. *See, e.g., Local 813 I.B.T. Ins. Trust Fund v. Sprint Recycling, Inc.*, No. 09-CV-04435 (FB)(RER), 2010 WL 3613839, at *4 (E.D.N.Y. Aug. 6, 2010) (citing

cases).[10]  With respect to historic rates, in approximately 2007 to 2008, "[o]verall, hourly rates

for attorneys approved in . . . Eastern District of New York cases . . . ranged from $200 to $350

for partners, $200 to $250 for senior associates, $100 to $150 for junior associates, and $70 to

$80 for legal assistants." *See Cho*, 524 F. Supp. 2d at 207 (collecting cases); *accord Access 4*

*All, Inc. v. 135 W. Sunrise Realty Corp.*, No. 06-CV-5487 (AKT), 2008 WL 4453221, at *6

(E.D.N.Y. Sept. 30, 2008).  In 2005 to 2006, partners earned between $200 and $300 per hour,

associates between $100 and $200 per hour, and paralegals earned between $70 and $80 per

hour. *See Kingsvision Pay-Per-View Corp., Ltd. v. Keane*, No. 02-CV-5173 (ILG)(MDG), 2006

WL 1704474, at *7 (E.D.N.Y. June 16, 2006) (citing cases).[11]  Stretching back to 2001, courts

awarded partners between $200 and $250, and associates between $100 and $200, while

paralegals earned between $50 and $65. *See Cioffi v. N.Y. Cmty. Bank*, 465 F. Supp. 2d 202,

218–19 (E.D.N.Y. 2006) (collecting historic rates).[12]

### e.  Calculating hourly rates in protracted litigation

In the context of protracted litigation, district courts have discretion to set an appropriate

hourly rate for calculating attorneys' fees in several ways.  Courts may "divide the litigation into

two periods, applying the current rate to the recent phase and the historic rate to the earlier

phase," or, similarly, factor historic and current rates into an average rate. *Grant v. Martinez*,

973 F.2d 96, 100 (2d Cir. 1992) (citing *N.Y.S. Ass'n for Retarded Children v. Carey*, 711 F.2d

---

[10] *See also Blue v. Finest Guard Servs., Inc.*, No. 09-CV 133(ARR), 2010 WL 2927398, at *15 (E.D.N.Y. June 24, 2010) (citing cases); *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229 (JG)(SMG), 2010 WL 1930237, at *8 n.13 (E.D.N.Y. May 11, 2010); *Gutman v. Klein*, No. 03-CV-1570 (BMC), 2009 WL 3296072, at *3 (E.D.N.Y. Oct. 13, 2009); *Melnick v. Press*, No. 06-CV-6686 (JFB), 2009 WL 2824586, at *9 (E.D.N.Y. Aug. 28, 2009) (citing cases); *Moran v. Sasso*, No. 05-CV-4716, 2009 WL 1940785, at *4 (E.D.N.Y. July 2, 2009); *Duverger v. C & C Duplicators, Inc.*, No. 08-CV-0721, 2009 WL 1813229, at *2 (E.D.N.Y. June 25, 2009).
[11] *See also Levy*, 2005 WL 1719972, at *9 (citing cases); *King v. N. Bay Contractors, Inc.*, No. 05-CV-2080 (NG)(RLM), 2006 WL 3335118, at *3 (E.D.N.Y. Oct. 25, 2006); *Comm'n Express Nat'l, Inc. v. Rikhy*, No. 03-CV-4050 (CPS), 2006 WL 385323, at *6 (E.D.N.Y. Feb. 16, 2006) (collecting cases).
[12] *See also Connor v. Ulrich*, 153 F. Supp. 2d 199, 202–03 (E.D.N.Y. 2001); *see also Hutchinson v. McCabee*, No. 95-CV-5449 (JFK), 2001 WL 930842, at *2–3 (S.D.N.Y. Aug. 15, 2001).

1136, 1153 (2d Cir. 1983); *Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242, 275 (E.D.N.Y. 2009) (dividing the litigation into an "Early Period" (1998–2005), and a "Current Period" (2005–2008), and awarding 75% of current rates for the Early Period and current rates for the Current Period); *M.L. ex rel. M.P. v. Bd. of Educ. of N.Y.*, No. 02-4288 (SHS), 2003 WL 1057476, at *3 (S.D.N.Y. Mar. 10, 2003) (awarding "$350 per hour for legal services provided from 1998-1999, and $375 for legal services provided in later time periods").

In the alternative, "[w]hen litigation spans a number of years, it is appropriate for the court to 'calculate and apply an average historic market rate for the period in question.' " *Epter v. N.Y.C. Transit Auth.*, 216 F.Supp.2d 131, 138 (E.D.N.Y. 2002) (quoting *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 146 (2d Cir. 1993)); *see McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91, 98 (2d Cir. 2006); *Sands v. Runyon*, 28 F.3d 1323, 1334 (2d Cir. 1994); *Carey*, 711 F.2d at 1153; *see also, e.g.*, *Scholastic, Inc. v. Stouffer*, 246 F. Supp. 2d 355, 358 & n.6 (S.D.N.Y 2003) (calculating average rate, for purposes of litigation spanning over two years, by averaging the attorney's rate for her first seven months of billing, $175 per hour, with that of her next fourteen months of billing, $203 per hour, to arrive at an average rate of $194). Use of an average rate prevents an attorney from receiving "a windfall due to the protracted nature of the litigation." *Saulpaugh*, 4 F.3d at 134. Finally, a court may award a fee based entirely on current rates. *See, e.g., Reiter v. MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006); *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998); *Port Auth. Police Asian Jade Soc'y of N.Y. & N.J., Inc. v. Port Auth. of N.Y. and N.J.*, 706 F. Supp. 2d 537, 541 (S.D.N.Y. 2010) (basing fee on current rates, five-year litigation).

### f.   Adjusting the Hourly Rates in the Revised Application

In considering the rates awarded in this District between 2001 and the present to attorneys of similar skill, experience and reputation to those seeking fees here, and to avoid a windfall to counsel given the protracted nature of this litigation, the Court finds that a reduction in the hourly rate in all categories is warranted to arrive at rates that most closely approximate an average historic market rate for the period of this litigation.

### 1.   Bromberg

As noted, Bromberg's hourly rate for the entire period of this litigation is billed at $350 per hour. This rate is at the high end of the range *currently* being paid in the Eastern District of New York for *partners* of comparable skill, experience and reputation, including in FDCPA cases, and well outside the historic average of Eastern District rates during the years 2001 to 2009. [13] Not only does Bromberg bill at this rate for his time as a partner (including during his early years in solo practice), he also uses this rate for time spent as an associate in the Law Firm of Peter Marc Stern. To avoid a windfall, the Court will reduce Bromberg's hourly rate, dividing his service into two readily-identifiable periods. For Bromberg's time as an associate with the Stern firm in 2001, the Court finds reasonable a rate of $200 per hour. For his time as a partner, billed both through the Bromberg Law Office and CAC, the Court finds reasonable a rate of $275 per hour.

### 2.   Raphael, Langone and Feofanov

Lance Raphael, Christopher Langone and Dimitry Feofanov are Chicago-based partners in separate consumer advocacy firms. All seek $350 per hour for all services. In support of their

---

[13] In support of his application, among other things, Bromberg has submitted an affirmation from Claudia Wilner, a New York-based consumer attorney not connected to this litigation. (*See* Doc. No. 230-20.) Ms. Wilner avers that $350 is a reasonable hourly rate in the Eastern District of New York for consumer debt attorneys, even though she cites no cases in support, and it appears from her own affidavit that she, herself, has never been awarded more than $300. Ms. Wilner's opinion regarding a rate she has never received is of little, if any, value.

fee applications, these attorneys submit affirmations that primarily show fee awards by Illinois

courts. The submissions of Raphael and Langone, in particular, show hourly rates for

themselves and other Illinois practitioners well in excess of the rate sought here. In fact, as

previously noted, Raphael's current billing rate is $550 per hour, and was the rate used in the

Original Application to calculate the lodestar for his work. Following Defendant's strong

objection, Raphael's hourly rate in the Revised Application has been changed to $350.[14] All

three of these lawyers have "agreed" to accept an hourly rate of $350 for this application only.[15]

However, as discussed above with regard to Bromberg, a rate of $350 is high for this

District, even for a partner, particularly given the number of years of this litigation. As such, the

Court finds reasonable for Raphael, Langone and Feofanov the same historic average hourly

partner billing rate as that used for Bromberg: $275 per hour.

### 3. Bardo, Dabisch, Frisch, and Nag

Stacy Bardo has worked on this litigation from its inception, first as an associate at CAC,

and from 2005 as a partner. She seeks an hourly rate of $300. This, too, is high, given the

historic average rates in this District for associates as well as partners. Moreover, Ms. Bardo's

work in this case was largely at the senior associate level, working primarily under and at the

direction of the three partners, Bromberg, Raphael and Langone. She did not appear in Court,

was never an attorney of record, and appears to have had very little, if any, substantive contact

with the Plaintiff or opposing counsel. Her work, while certainly contributing to the outcome

here, was done largely behind the scenes, and even while a partner, included various ministerial

---

[14] On reply, Bromberg asserts that this was done in error, and correctly notes that in Raphael's affirmation in support of the Original Application, Raphael indicates that he will accept an hourly rate of $350. That "error" represents a full 44% of the difference between the Original and Revised Applications.

[15] The Second Circuit held that "in order to receive an attorney's fee award based on higher out-of-district rates, a litigant must overcome a presumption in favor of the forum rule, by persuasively establishing that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 175 (2d Cir. 2009). As Raphael and Langone seek rates comparable to current in-district rates, *Simmons* is not implicated.

duties such as ensuring documents were complete, and filing submissions with the court. As such, the Court finds reasonable an overall average historic hourly rate of $225 for Bardo.

Langone's associates, Joel Dabisch and Craig Frisch, are billed at $300 per hour. For the same reasons, their rate will be reduced to $225. Bromberg's associate, Aditi Nag, is billed at $175 per hour. These fees will be eliminated in their entirety as Bromberg has stated, albeit incorrectly, that he has deducted all Nag's hours from the Revised Application "as a compromise." (*See* Doc. No. 230, p.10.)

#### 4. Paralegals and law student Kenneth Hammer

The paralegals at CAC seek $90 per hour, while those at the Langone firm seek $150. Both of these rates are high, particularly given the span of years involved. Moreover, to ensure proportionality between attorney and non-attorney hourly rates, all paralegal rates will be reduced to a historic District average of $70.

Bromberg seeks reimbursement at a rate of $115 per hour for Kenneth Hammer, a Brooklyn Law School summer intern. In support of this rate, Bromberg notes that Hammer had worked for two judges in the Eastern District, and thus he "billed Hammers services" at what he considered a reduced associate rate. While laudable, that experience does not warrant equating Hammer's skill and experience with that of a law firm associate, even at a discounted rate. Moreover, Bromberg does not indicate whether Hammer was actually paid a salary by the firm, or volunteered his services as many students do. As such, the Court will strike the request for these fees.

17

### 5.  Summary of Hourly Rate Reductions

The chart below summarizes a revised lodestar based on the hourly rate and other reductions discussed above:

| Law Firm | Fee requests in Revised Application | | | Adjusted Hourly Rate | New Lodestar |
|---|---|---|---|---|---|
| | Hours | Rate | Lodestar Amount | | |
| **Peter Marc Stern** | **58.75** | **$350** | **$20,562.50** | **$200.00** | **$11,750.00** |
| Bromberg | 58.75 | $350 | $20,562.50 | $200.00 | $11,750.00 |
| **Bromberg Law Office, P.C.** | **287.9** | | **$81,595.00** | | **$55,412.50** |
| Bromberg | 201.5 | $350 | $70,525.00 | $275.00 | $55,412.50 |
| Hammer | 67.5 | $115 | $7,762.50 | $0.00 | $0.00 |
| Nag | 18.9 | $175 | $3,307.50 | $0.00 | $0.00 |
| **Consumer Advocacy Center, P.C.** | **368.2** | | **$123,422.00** | | **$96,236.00** |
| Bromberg | 176 | $350 | $61,600.00 | $275.00 | $48,400.00 |
| Raphael | 116 | $350 | $40,600.00 | $275.00 | $31,900.00 |
| Bardo | 68.4 | $300 | $20,520.00 | $225.00 | $15,390.00 |
| Paralegals | 7.8 | $90 | $702.00 | $70.00 | $546.00 |
| **Langone** | **250.25** | | **$81,637.50** | | **$62,836.25** |
| Langone | 150.75 | $350 | $52,762.50 | $275.00 | $41,456.25 |
| Dabisch | 49 | $300 | $14,700.00 | $225.00 | $11,025.00 |
| Frisch | 44 | $300 | $13,200.00 | $225.00 | $9,900.00 |
| Paralegals | 6.5 | $150 | $975.00 | $70.00 | $455.00 |
| **Feofanov** | **53.7** | **$350** | **$18,795.00** | **$275.00** | **$14,767.50** |
| **TOTALS** | **1018.8** | | **$326,012.00** | | **$241,002.25** |

### B.  The Need to Present Adequate Billing Records

Applications for attorney's fees must be documented by contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done, along with affidavits and other materials. *See Hensley*, 461 U.S. at 437 n.12; *Prendergast*, 450 F.3d at 97; *Kirsch*, 148 F.3d at 173; *Chambless v. Masters, Mates & Pilots Pension Plan*, 885 F.2d 1053, 1058 (2d Cir. 1989); *Lewis v. Coughlin*, 801 F.2d 570, 577 (2d Cir. 1986); *Carey*, 711 F.2d at 1147–48. "[A]ny attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent." *In re Hudson & Manhattan*

*R.R. Co.*, 339 F.2d 114, 115 (2d Cir. 1964).  Inadequate documentation is grounds for reduction

of a fee award.  *See Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1343 (2d Cir. 1994);

*Levy v. Powell*, 00-CV-4499 (SJF), 2005 WL 1719972, at *6 (E.D.N.Y. July 22, 2005).

A court may reduce a fee award if the applicant bases its submissions on entries that are

so vague, ambiguous or otherwise lacking in sufficient detail that the court cannot assess them

for reasonableness.  *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1265 (2d

Cir. 1987) (refusing to award fees for descriptions such as "Rev. Doc." or "Clients re testimony")

(citing with approval *In re Ury*, 485 N.Y.S.2d 329, 330 (App. Div. 1985) (requiring, at

minimum, a "categorical breakdown" of services rendered)); *Baim v. Notto*, 316 F. Supp. 2d 113,

122 (N.D.N.Y. 2003).  "[M]ere characterization of the type of work done, without specifying the

purpose and specific subject matter of the task," is insufficient.  *Parrish v. Sollecito*, 280 F.

Supp. 2d 145, 171 (S.D.N.Y. 2003) ("Entries such as 'Review Parrish file,' 'Research,' and

'Drafting, Research' are insufficiently particular.").  Overbroad descriptions of work done – e.g.,

"legal research," "file review," or "document inspection and review" – are "too imprecise and

vague for meaningful [court] review." *Ayers v. SGS Control Servs., Inc.*, Nos. 03-CV-9078

(RMB), 06-CV-7111 (RMB), 2008 WL 4185813, at *7 (S.D.N.Y. Sept. 9, 2008); *see Schruefer

v. Winthorpe Grant, Inc.*, No. 99-CV-9365, 2003 WL 21511157, at *3 (S.D.N.Y. July 2, 2003)

(reducing lodestar for imprecise and vague time entries such as "various phone conferences";

"review file"; "legal research"; and "case administration"); *Cosgrove v. Sears, Roebuck and Co.*,

No. 81-CV-3482 (AGS), 1996 WL 99390, at *3 (S.D.N.Y. Mar. 7, 1996).  A fee application may

be reduced if based on entries that are "too vague to accurately determine what was in fact

done," "indecipherable," or susceptible to the interpretation that "more than one person charged

time for the same task." *Saunders*, 2009 WL 4729948, at *8.

However, otherwise vague or ambiguous entries may be sanitized, and reduction may be avoided, if the court can assess reasonableness using context and surrounding entries. *See Bridges v. Eastman Kodak*, No. 91-CV-7985 (RLC), 1996 WL 47304, at *4 (S.D.N.Y. Feb. 6, 1996) (declining to reduce the presumptively reasonable fee amount, notwithstanding occasional vague descriptions of work, as the records, overall, indicated reasonableness of each task and time expended); *Meriwether v. Coughlin*, 727 F. Supp. 823, 827 (S.D.N.Y. 1989) (vague entries made more specific by subsequent entries); *U.S. Football League v. Nat'l Football League*, 704 F. Supp. 474, 477 (S.D.N.Y. 1989) (same); *Lenihan v. City of N.Y.*, 640 F. Supp. 822, 826 (S.D.N.Y. 1986) (same). While reductions can be made to specific entries, a court need not scrutinize each hour billed and instead, can use a percentage cut "as a practical means of trimming fat from a fee application." *Carey*, 711 F.2d at 1146.

Upon its thorough review, the Court finds a number of issues with the billing records submitted in support of Plaintiff's Revised Application that support a further reduction of the fee award. Each will be addressed in turn.

### a. Bromberg's Billings Through CAC

Brian Bromberg served as Plaintiff's lawyer since the inception of this litigation and consistently throughout its ten-year history, serving as lead counsel through trial and on this fee application. Not surprisingly, his fees account for the bulk of the fee request. Bromberg's billing records are submitted from three separate law firms as follows. For the period February 2001 through approximately late October 2001, Bromberg has submitted what he avers to be his contemporaneous billing records from the Law Firm of Peter Marc Stern, where he served as an associate. (Revised Application, Bromberg Aff., Ex. B (Doc. No. 230-3).) In late October 2001, Bromberg opened his own law office. For the period from approximately November 8, 2001 to

June 11, 2002, and again for the period from approximately June 22, 2006 to the present, Bromberg submitted what he avers to be his contemporaneous billing records from the Bromberg Law Office, P.C., located in New York. (*Id.*, Ex. A (Doc. No. 230-2.).) These records also reflect all costs incurred by the Bromberg Law Office, P.C. from approximately November 28, 2001 to the present, almost the entire pendency of the litigation.

However, notwithstanding the fact that Bromberg maintained his own law firm in New York, for the period from approximately January 19, 2003 through approximately September 26, 2005, Bromberg has submitted as evidence of his work billing records of CAC, the Chicago-based firm of his co-counsel. (*Id.*, Ex. C (Doc. No. 230-4).) Bromberg avers that during this time period, he "kept [his] time records on [his] co-counsel's computer system" and "continued keeping track of [his] office's costs on [his] computer in New York." (Original Application, Bromberg Aff. (Doc. No. 225-2), ¶ 7.) Based on these records, Bromberg seeks $61,600 in fees, which represents well over one-third of the $163,757 in total fees Bromberg seeks in the Revised Application.[16]

An examination of the CAC billing records show that individual entries for work Bromberg claims to have done on this case – marked "BB" – are chronologically interspersed with the individual entries for the CAC attorneys and paralegals working on this matter. Indeed, taking the CAC records at face value, one is led to believe that "BB" is merely another CAC staff member, most likely an attorney given the billing rate of $300 per hour. There is absolutely no explanation in Bromberg's affidavit in support of his fee application, or anywhere else in the record, as to why Bromberg kept his billing records on CAC's computers. This unusual arrangement raises further concern regarding the accuracy and contemporaneous nature of these

---

[16] The CAC records submitted in support of the attorneys actually affiliated with CAC span the period January 4, 2001 through October 28, 2009. Bromberg's first entry appears on January 19, 2003, and his last appears to be on September 25, 2005.

records in light of the fact that for the time period both immediately preceding and immediately following that reflected in the CAC records, Bromberg kept detailed billing records on his own law firm computer for himself and others working for him. In addition, while maintaining hourly billing records through CAC, Bromberg used his own law firm's computers to keep track of all costs incurred by the Bromberg Law Office since virtually the inception of the litigation in 2001.

Also troubling is the fact that Bromberg in no way explains how he kept track of his hours and tasks, and how and when he (or someone on his behalf) transmitted the relevant information to CAC, nor is there any information as to how and when Bromberg's information came to be included in the CAC records. Moreover, the CAC records, as well as those of the Bromberg Law Office, are wholly computer generated, and look very similar in terms of font, columns, and the like. Although they are denoted as "billing records," there is nothing in the record, either from Bromberg or from a representative of CAC, to suggest that these computer printouts were created by billing software as opposed to a word-processing program, nor is there any indication as to whether there were other source billing records (such as handwritten ledgers, diaries, notes, or other contemporaneous records) from which the computer entries were made.[17] In short, there is nothing to assure this Court that Bromberg's billings through CAC are either contemporaneous or accurate. As such, the Court finds this to be one of several bases to apply an across-the-board 30 percent cut in the lodestar amount as revised by the Court.

### b. Vague Billing Entries

As discussed above, a court reviewing a fee application must have sufficiently-detailed records to determine the nature and reasonableness of the attorney's task and the reasonableness

---

[17] This stands in contrast to Raphael's Reply declaration submitted with the Revised Application, in which he advises that CAC maintained its records for *costs* using QuickBooks software to keep track of expenditures.

of the hours expended in carrying it out.  Billing entries of firms submitted in support of the
Revised Application are replete with entries that do not conform to this standard.  The Court will
not belabor this point.  Defendant, in its opposition, has documented many such examples, and a
cursory glance at the records of all firms involved here will show such entries at "T/client,"
"Correspondence with Judge Levy,"[18] or "Telephone call with co-counsel."  Many such entries
originally challenged by Defendant have been eliminated; however, others, representing a fair
portion of fees sought, remain.

      As noted previously, none of the attorneys seeking fees have explained the basis for the
line-item reductions in the Revised Application.  Many entries to which Defendants objected
were retained, even though others seemingly for the same task were eliminated.  All of the
attorneys in this matter are experienced practitioners in FDCPA litigation and its fee-shifting
provisions.  Moreover, they are well aware of the acceptable standards for billing practices that
will properly support a fee application, and had their fees reduced by district courts *in this very*
*district* because of their billing practices.  *See, e.g., Larsen v. JBC Legal Grp., P.C.*, 04-CV-4409
(ETB), 2008 U.S. Dist. LEXIS 106607, at *10 (E.D.N.Y. Dec. 18, 2008) (excluding from fee
petition a portion of Bromberg's fees due to vague and inadequate entries); *Cinelli v. MCS Claim*
*Servs., Inc.*, 236 F.R.D. 118, 122–23 (E.D.N.Y. 2006) (excluding from fee petition all of
Raphael's and Bardo's fees for similar reasons).

      The fact that a significant portion of the entries overall contain vague or merely
generalized descriptions of the activities undertaken make it impossible for the Court to
determine both 1) whether the reductions taken in the Revised Application were reasonable and
sufficient to meet Defendant's objections, and 2) whether the billings were reasonable from the

---

[18] It should be noted that Bromberg, Raphael and Langone frequently represented litigants in other actions pending
in this district during the relevant billing period here.

start given the hours devoted to the particular task.  These deficiencies in the billing records,

even standing alone, form an appropriate basis for an across-the-board reduction.

### c.  Christoper Langone's Reconstructed Records

Defendants object to all fees sought by Christopher V. Langone on the ground that the

bulk of his fee application is based on a reconstruction of his time records.[19]  The Court will not

strike Langone's petition for fees as Defendants seek, but will reduce his request by the same

across-the-board percentage as that applied to all of the billing entries submitted.

Langone maintained his own law firm in Chicago that specialized in consumer rights and

unfair business practices.  (Original Application, Langone Aff. (Doc. 225-5), ¶ 1.)  He entered a

notice of appearance in this action on November 15, 2001 and was the attorney "primarily

responsible for briefing and arguing summary judgment [before Judge Raggi] and briefing and

successfully arguing the appeal in the Second Circuit. *Miller v. Wolpoff & Abrahmson LLP.*, 321

F.3d 292 (2d Cir. 2002)."  (*Id.* at ¶ 5.)[20]  He closed his law office in 2006 – 2007 after enrolling

in Cornell University's Ph.D. program in communications, and has practiced only part-time in

Illinois to wind up certain cases and appeals.  (*Id.* at ¶ 4.)

As Langone avers, his firm kept contemporaneous time records using various time-

keeping software programs, some of which were lost when the firm's servers were dismantled

and could not be recovered.  (*Id.* at ¶ 10.)  However, he has reconstructed the records submitted

in support of his fee application, (*see id.*, Ex. A), as follows:

> These records have been compiled and reviewed by me based on a combination of
> data, including contemporaneous records and notes, estimates of work done based
> on records and available data and write downs and estimates of reasonableness
> based on the nature of the task, the degree to which time is reasonable under the

---

[19] The Langone application includes fees for himself, two associates Joel D. Dabisch and Craig Frisch, and various paralegals.
[20] Although he suggests that his role was thus limited, Langone actually bills through 2005, and appears to have been actively involved in discovery and the settlement discussions with WA.

circumstances and the exercise of billing judgment.  Portions of these records have been reconstructed in accordance with Illinois and federal case law.

(*Id.* at ¶ 11 (citations omitted).)  Langone further explains that he still has some raw billing data, such as printouts of contemporaneous billing records and handwritten notes.  (Langone Supplemental Reply Mem. (Doc. No. 231), 2-3.)  Using this method, Langone seeks on behalf of himself and others in his firm a total of $81,637 as reflected in the Revised Application.

As noted above, contemporaneous time records are a prerequisite for attorney's fees in this Circuit.  *Carey*, 711 F.2d at 1147-48.  "The burden is on counsel to keep and present records from which the court may determine the nature of the work done, the need for it, and the amount of time reasonably required; where adequate contemporaneous records have not been kept, the court should not award the full amount requested."  *F.H. Krear & Co.*, 810 F.2d at 1265; *see also Soler v. G&U Inc.*, 801 F. Supp. 1056, 1060 (S.D.N.Y. 1992).

Here, notwithstanding the fact that Langone's application is based in part on *some* of the raw data, by Langone's own admission, he has used estimates of work done, reasonableness based on the nature of the task, write downs, and billing judgment to arrive at his lodestar request.  In the Second Circuit, applications for attorney's fees in which counsel have not kept contemporaneous time records are subject to a 30 percent reduction from the lodestar.  *See Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 749 F.2d 1000, 1008 (2d Cir. 1984) (30% reduction appropriate when no contemporaneous time sheets are kept); *see also Orshan v. Macchiarola*, 629 F. Supp. 1014, 1019 (E.D.N.Y. 1986) (same).  This Court finds that Defendant's request to fully strike Langone's application is unduly harsh, given his contributions to this case.  After all, without the success on appeal, and Langone's contribution to that success, this litigation would have long been over, with complete defeat for Plaintiff.  As the Circuit has

suggested, applying to Langone's reconstructed billing the across-the-board cut the Court is imposing overall is wholly appropriate.

### C. Overstaffing and Excessive and Redundant Billing

"In determining what fee is reasonable, the court takes account of claimed hours that it views as 'excessive, redundant, or otherwise unnecessary.' " *Bliven v. Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (quoting *Hensley*, 461 U.S. at 434). Although a litigant's "use of multiple attorneys . . . is not unreasonable *per se*," *Williamsburg Fair Hous. Comm. v. Ross-Rodney Hous. Corp.*, 599 F. Supp. 509, 518 (S.D.N.Y. 1984), "a trial judge may decline to compensate hours spent by collaborating lawyers or may limit the hours allowed for specific tasks . . . on the basis of [the trial judge's] own assessment of what is appropriate for the scope and complexity of the particular litigation." *Carey*, 711 F.2d at 1146. Duplication triggers reduction because it necessarily implies that "some of the work was unnecessary and the time claimed would therefore be unreasonable." *Williamsburg*, 599 F. Supp. 509, 518.

If the presence of multiple attorneys created inefficiencies that unreasonably increase "the total number of man-hours expended over the course of the litigation," reduction is appropriate. *Simmonds v. N.Y.C. Dep't of Corr.*, No. 06-CV-5298 (NRB), 2008 WL 4303474, at *6 (S.D.N.Y. Sept. 16, 2008). Fees requested by multiple attorneys should reflect a reasonable division of work that takes account of each attorney's relevant strengths, weaknesses and "varying degrees of expertise." *King v. STL Consulting, LLC*, No. 05-CV-2719 (SJ), 2006 WL 3335115, at *8 (E.D.N.Y. Oct. 3, 2006); *see Handschu v. Special Servs. Div.*, 727 F. Supp. 2d 239, 252 (S.D.N.Y. 2010); *Simmonds*, 2008 WL 4303474, at *6 (reducing by 40 percent where "the billing records indicate[d] . . . that the delegation of authority [between two law firms] was rarely, if ever, complete," that "litigation tasks were often assigned without particular regard for

26

any institutional advantages that one firm might have over the other," that "both firms were heavily involved in all aspects of the litigation," and that "[a]ttorneys from both firms routinely reviewed and revised each others' work product and jointly attended court conferences and meetings with clients and co-counsel").

Defendant raises significant objections to the fees sought on this basis.  Based on its full familiarity with this litigation, and upon its thorough review of the billing records in support of the fee application, the Court finds, in the exercise of its discretion, that an across-the-board downward adjustment to the fees sought in the Revised Application is warranted because of overstaffing, and excessive and redundant billing.  Indeed, this Court finds that overstaffing and redundancy are sufficient, standing alone, to support the 30-percent reduction in fees that the Court imposes herein.

It should be noted at the outset that, with the exception of Langone, who was forced to more fully explain the reconstruction of his records by detailing his work on the case, none of the other attorneys seeking fees explain, even generally, the nature of their work on this case or the division of responsibilities between the lawyers. *See Cinelli*, 236 F.R.D 118 at 123 (eliminating fee award to Raphael on this and other bases).  And in the face of vigorous claims by Defendant that this case had been overstaffed, Plaintiff proffers as its sole retort:

> Over the roughly nine years, almost all the work performed has been done by four attorneys: [Bromberg, Langone, Raphael and Bardo].  Because Langone, who had been scheduled to try the case with Bromberg, was unavailable, Dmitry Feofanov flew in from Chicago to assist at the trial.  All Plaintiff's counsel work in small offices with four or less attorneys.
>
> Jointly representing [WA] and UCS were at leave five attorneys at the 750-attorney firm of Wilson, Elser, Moskowitz, Edelman & Dicker LLP . . . . In addition, behind the scenes, two attorneys at the once-large but now insolvent law firm of [WA] . . . were actively participating in the defense. . . . Thus, the tally is seven against five.  Defendants' point is not well taken.

27

(Revised Application 2.)

Plaintiff correctly notes the relative disparities in size between the firms seeking fees here and the firm representing both WA and UCS in this matter, and the Court fully appreciates the difficulties faced by small firms and solo practitioners in litigating cases such as this. However, this argument is hardly sufficient to absolve the attorneys of their burden of proof on this petition, and to belie what is a clear pattern of redundancy and overstaffing that is set forth in the billing records.

This Court's painstaking examination of the billing records submitted in support of the Revised Application demonstrates considerable redundancy in the number of lawyers participating in meetings and conferences, and in drafting and, particularly, reviewing written work. The billings are replete with instances in which simple, straightforward submissions or actions, drafted or taken by Bromberg, would have to be vetted, edited, or otherwise reviewed by other attorneys, including co-partners Raphael or Langone. The reverse is also well documented. Each of these partners are contemporaries of one another, all having graduated from law school in 1992 or 1993, each with similar expertise in their chosen field of specialty, and each seeking hourly rates at the top of the range for FDCPA cases in this district. The Court finds that such multiple layers of review between experienced partners was excessive, given the nature of the tasks involved.

While careful review of work is critical to the success of any litigation, "[t]here is a difference between assistance of co-counsel which is merely comforting or helpful and that which is essential to proper representation." *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1206 (10th Cir. 1986) (upholding district court's discretion in striking completely fee application of a second, unnecessary attorney expert in consumer debt law). A significant number of the

checks and balances employed in this case fall in the former category, and resulted in redundancies and excessive billings, particularly among these three partners. *See Kapoor v. Rosenthal*, 269 F. Supp. 2d 408, 415 (S.D.N.Y. 2003) (reducing fee application by Bromberg and Raphael where both attorneys engaged in duplicative work).

In addition, the Court finds myriad entries for which attorneys devote excessive number of hours to a particular task, given its complexities (or lack thereof). As Defendant notes, a prime example comes from the hours billed in the Revised Application relating to preparing and filing the complaint. Raphael bills for12.65 merely for drafting (not researching) what is a straightforward complaint, given Raphael's experience and expertise (even in 2001), and particularly after the many hours both he and Bromberg spent (and bill separately for) researching the claims. Moreover, though it appears Raphael both drafted and thoroughly reviewed the complaint, Bromberg bills an additional seven hours on the day of filing to consult with Raphael and to prepare the documents for submission. This is clearly excessive, and the record is replete with such examples.

Rather than scrutinize each grouping of entries that demonstrate such overstaffing, an across-the-board percentage cut has clearly been "endorsed . . . as a practical means of trimming fat from a fee applications." *Carey*, 711 F.2d at 1146.

### D. Success in the Litigation

Related to its arguments regarding excessive billing are Defendant's vigorous challenges to the fee application based on limited success in the litigation, for which Defendant urges the Court to employ an across-the-board reduction of a full 50 percent of the lodestar. In addition, Defendant seeks elimination of certain billings attributed to discrete aspects of the litigation – the initial summary judgment motion and ensuing appeal, and specific motions related to class

29

certification and discovery – that either were wholly unsuccessful, or were never made.  As the following discussion shows, the Court finds that limited success and, additionally, further evidence of excessive billing, support the Court's across-the-board reduction.

### a. Applicable Law

" [T]he most critical factor' in a district court's determination of what constitutes reasonable attorney's fees in a given case 'is the degree of success obtained' by the plaintiff." *Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)); *see, e.g.*, *Healey v. Leavitt*, 485 F.3d 63 (2d Cir. 2007); *Patterson v. Balsamico*, 440 F.3d 104, 123 (2d Cir. 2006); *Kassim v. City of Schenectady*, 415 F.3d 246, 254 (2d Cir. 2005); *Saunders*, 2009 WL 4729948, at *6.

"Success" is not measured solely or simply by whether a plaintiff prevailed on individual claims. *See Barfield*, 537 F.3d at 152; *Kassim*, 415 F.3d at 254.  " '[T]he quantity and quality of relief obtained,' as compared to what the plaintiff sought to achieve as evidenced in her complaint, are key factors in determining the degree of success achieved." *Barfield*, 537 F.3d at 152 (quoting *Carroll v. Blinken*, 105 F.3d 79, 81 (2d Cir.1997)).  When a plaintiff raises " 'distinctly different claims for relief that are based on different facts and legal theories,' " against multiple parties, but is unsuccessful with respect to some of those claims, courts reduce the award for time spent on the unsuccessful claims. *Kassim*, 415 F.3d at 253 (quoting *Hensley*, 461 U.S. at 434–35).  Where, however, a plaintiff's case is "unitary," that is, one which presents only a single claim or presents multiple claims which involve a common core of facts or will be based on related legal theories, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation, and the fee award should not be reduced simply because the plaintiff failed to prevail on every

contention raised in the lawsuit." *Id.* (quoting *Hensley*, 461 U.S. at 435–36); *see Hardaway v. Ridgewood Corp.*, 706 F. Supp. 2d 436, 440 (S.D.N.Y. 2010).

      Where a plaintiff's complaint is cast as a putative class action, but certification is not obtained, a district court may reduce the award if it finds that class certification was "plaintiff's primary aim in [the] litigation," as shown by the complaint and the course of the litigation. *Barfield*, 537 F.3d at 152 (upholding district court's 50% fee reduction where class certification, plaintiff's primary aim in the litigation, was denied). A district court should consider whether, under the circumstances, a determination not to reduce the award may have harmful prospective effects, such as "decreasing the incentive for plaintiffs' lawyers vigorously to litigate collective action certification," or "encouraging plaintiffs' lawyers to file collective action-based claims even where there is little basis for doing so." *Id.* Where a plaintiff researches a motion for class certification, but never files the motion, however, the court also should consider "whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Imbeault v. Rick's Cabaret Int'l Inc.*, No. 08-CV-5458 (GEL), 2009 US DIST LEXIS 71562, at * 17 (S.D.N.Y. Aug. 13, 2009) (citation omitted); *see also Falleson v. Paul T. Freund Corp.*, 736 F. Supp. 2d 673, 676 (W.D.N.Y. 2010) (reducing by 60% the number of hours charged on a finding that "the number of hours expended was excessive" because, *inter alia*, "this matter never reached the point of collective action certification").

      It is critical to note that a fee award need not be "proportionate" to a plaintiff's statutory recovery, as here, in an FDCPA case, where such a requirement would undermine the purpose of FDCPA cost-shifting: " 'to secure legal representation for plaintiffs whose . . . injury was too small, in terms of expected monetary recovery, to create an incentive for attorneys to take the case under conventional fee arrangements.' " *Rivera*, 540 F. Supp. 2d at 338 (quoting *Kassim*,

415 F.3d at 252; *see Quarantino*, 166 F.3d at 426 ("Congress meant reasonable attorney's fees to be available to the private attorneys general who enforce the law"); *Baruch v. Healthcare Receivable Mgmt., Inc.*, No. 05-CV-5392 (CPS)(JMA), 2007 WL 3232090, at *6 (E.D.N.Y. Oct. 30, 2007).

Plaintiff makes this very argument in opposing Defendant's request for a 50-percent reduction for limited success, noting that "Miller succeeded in obtaining the maximum possible recovery to which he is entitled." And the Court herein does not in any way measure Plaintiff's success or his entitlement to a reasonable attorney's fee based on the proportionality between the two. However, as the following discussion shows, Plaintiff ignores other compelling reasons that warrant a reduction to the fee petition.

### b. Overall Success

It is undisputed that the litigation as originally brought was far different in nature and scope than that through which Plaintiff ultimately prevailed. Plaintiff filed his complaint on February 23, 2001 as a putative class action. The Complaint alleged that WA, UCS, and NAN, "individually and as joint-venturers and co-conspirators, violated the FDCPA (1) by sending debt collection letters on attorney letterhead without meaningful review by any attorney of the circumstances surrounding plaintiff's alleged debt, (2) by attempting to collect attorneys' fees that were to be shared with NAN as a referral fee in violation of state professional ethics rules, and (3) by mailing a letter that would confuse the 'least sophisticated consumer' as to his or her rights." *Wolpoff & Abramson*, 321 F.3d at 298.

These claims involved multiple defendants and diverse theories of liability predicated on different facts. Five different sub-classes were created based on separate theories of alleged misrepresentations in wholly different collection letters, some issued by WA and only one issued

by UCS. The fee splitting claim is in no way related to alleged misrepresentations under the FDCPA. While these defendants may have been linked through their business practices and through Plaintiff's attempt to allege conspiratorial conduct, they were sued on discrete and diverse claims predicated on myriad facts and circumstances. Moreover, Plaintiff initially sought both statutory and actual damages.

Most important to this analysis, on summary judgment before then-District Judge Raggi, all claims were dismissed as against all Defendants. And on appeal, Plaintiff achieved very limited success. None of the claims against NAN were reinstated. And only one claim against WA and UCS – that relating to meaningful attorney review – was reinstated, and only because its dismissal was premature. The District Court's dismissal of all other claims against these Defendants, alleging different, wholly independent theories of liability under the FDCPA, was solidly upheld on appeal. As Defendant notes, "[t]he complaint as drafted included page upon page of putative class allegations of a joint venture, conspiracy and purported illegal fee splitting between [WA], UCS and NAN – all of which was dismissed at the outset of the case. . . . Buried in the 145 paragraph complaint, in Count IV[,] are the 2 paragraphs containing the one allegation pertaining to UCS that actually survived all the motions and appeals." (Defendant's Opposition 10).

Even focusing narrowly for the moment on the fees sought in Revised Application for this limited period in the history of this litigation – from the preparation and filing of the Complaint through decision on appeal – the Court finds additional excessive billing as an additional ground to reduce the fee award. First, it is important to remember that these applications seek fees from only one of the Defendants sued herein. However, the fee petitions seek reimbursement for work billed to a motion and an appeal directed at three separate

33

defendants against whom Plaintiff brought a number of wholly-unrelated claims alleging distinct theories of FDCPA liability.  While the Revised Application eliminates or reduces specific billings for the motion and the appeal, the attorneys still bill for a large portion of their time related to these largely-unsuccessful endeavors. [21]  Second, Plaintiff was largely unsuccessful at both stages.  Only one single theory of out of many pled survived appeal:  whether WA and/or UCS, alone or, in one claim, together, conducted a meaningful attorney review before mailing letters to Plaintiff and class members.

It is also undisputed that Plaintiff pursued, but ultimately never sought, class certification against UCS.  Plaintiff appears actively to have pursued discovery related to class certification against both UCS and WA.  (*See, e.g.*, Defendant Letter (Doc. No. 136), Jan. 20, 2005 (responding to Plaintiff's request for discovery on the issues of class size and revenue information, as relevant to class damages under the FDCPA); Plaintiff letter (Doc. No. 131), Jan. 10, 2005 (interrogatories concerning certification issues); Orders of Magistrate Judge Levy, dated Dec. 17, 2004; Feb. 25, 2004; May 22, 2003 (ruling on class discovery-related issues).  The last certification-related activity appears to have been in February of 2005, when Magistrate Judge Levy deferred further discovery on certification issues until after Chief Judge Dearie's decision on a second summary judgment motion.  (*See* Order of Magistrate Judge Levy, Feb. 15, 2005.)

---

[21] As has been noted many times herein, it is impossible to tell from the affirmations of the attorneys, or the records themselves, why some entries were eliminated, yet others were retained or merely reduced.  For example, while entries referring to "NAN" appear to have been eliminated in their entirety, the Court finds a wholly mixed result with respect to entries referencing "WA," with some eliminated and others, without any apparent rhyme or reason, reduced by 50 percent.  Most important, only two billing entries refer to specific tasks on appeal taken with regard to UCS.  Still other entries are so vague that the Court cannot determine whether the specific task – some seeking reimbursement in the thousands of dollars –reasonably related to the motion or appeal, or how it relates to the Plaintiff's limited success with respect to UCS.  Thus, whether viewed on the basis of limited success, or on the basis of excessive billing supported by vague records, the Court finds grounds for further reduction of the fees sought from UCS for this period, given the limited nature of Plaintiff's success against this party, and the number of claims and parties involved in these aspects of the litigation.

In the Revised Application, Plaintiff concedes that "in order to accommodate Defendant's objections, Plaintiff is removing those time entries relating to class certification." (Revised Application 5). However, once again, Plaintiff does not particularize which of those entries fall into this category. While it is clear from the text of some of the billing entries removed that they relate to class certification, there are clearly others that still remain. Some are wholly vague in description, but clearly involve class claim activities as demonstrated by the context of the litigation.[22] Others related to class claim issues relating to other defendants. Fees are still sought, perhaps due to the fact that Defendant did not object to those entries. However, the burden rests with the attorneys here, and the attorneys' own submissions and poor record-keeping have, once again, provided a basis to support an across-the-board cut in fees sought if not for limited success as discussed below, on the bases that there still remain in the Revised Application excessive billing entries related to class certification.

The claims that moved forward from appeal, through consent judgment with WA, a second summary judgment motion against UCS alone, and ultimately trial against UCS were somewhat "unitary," as Plaintiff maintains. While they rested on separate mailings from these two firms – several from WA alone and only one from UCS – UCS relied in part on WA's own attorney review to claim that it had satisfied its review obligations under the FDCPA and the Second Circuit's decision in *Clomon v. Jackson*, 988 F.2d 1314 (2d. Cir. 1993). However, given the nature of the remaining claims, including the class claims, the bulk of which pertained to WA, most of that discovery focused on the review procedures employed by WA, not UCS. And most important, as the consent judgment with WA plainly states, that discovery revealed "no

---

[22] By way of example, the Court notes various entries that generally indicate hours billed to prepare for a discovery conference with the Magistrate Judge immediately prior to a conference that dealt almost entirely with class discovery.

violations of the Fair Debt Collection Practices Act were found in the handling of [Plaintiff's] account by the firm of Wolpoff and Abramson L.L.P." (Consent Judgment (Doc. No. 162) ¶ 6.)

There were no subsequent efforts by Plaintiff to revive class discovery, and the case proceeded to a bench trial against UCS on one single issue: whether UCS engaged in a meaningful attorney review sufficient under the FDCPA before sending to Plaintiff a validation notice. The case proceeded solely as an individual action by Plaintiff. However, Plaintiff could have sought further class relief based on similar letters sent to class members, challenging UCS's own internal practices, but he chose not to. In addition, class claims would have been the sole vehicle through which Plaintiff could have achieved actual damages over and above the maximum recovery allowed under the FDCPA. *Cf. Imbeault*, 2009 U.S. Dist. LEXIS 71562, at *31 (no reduction for limited success where wider claims would not have led to additional remedies) (citing *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 542 (S.D.N.Y. 2007)). Moreover, no damages other than those accorded under the statute were sought. *See Miller v. Upton, Cohen & Slamowitz*, 687 F. Supp. 2d 86, 88–89 (E.D.N.Y. 2009) (this Court's findings of fact and conclusions of law after bench trial.)

Thus, when looking at the litigation as a whole, Plaintiff pressed this case to trial and succeeded only on one single individual claim for which he received the maximum statutory recovery. This, despite the sweeping allegations originally made against Defendant UCS and additional class claims and relief that were abandoned without explanation on the eve of trial. (*See* Joint Pre-Trial Order, (Doc No. 188).) Thus, the Court finds that a reduction is warranted for limited success, given that Plaintiff pursued inflated claims against UCS from the inception. *See Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004) (per curiam) (reduction of 20% for inflated claims dropped immediately prior to trial).

36

### E.  "Screen Shots" and the Methodology of the Revised Application

Notwithstanding Defendant's objections, Plaintiff continues to bill for litigation relating to the production of the so-called "screen shots" or "paperless file" of UCS, images of UCS's computer screens that Plaintiff's believed would help prove a lack of meaningful attorney involvement.  Plaintiff attempted to re-open discovery for this purpose in October 2007, after denial of the second summary judgment motion and after preparation of the Joint Pre-Trial Order.  (*See* Doc No. 193.)  The Magistrate Judge denied this application, and Plaintiff appealed to Chief Judge Dearie, who again denied the motion.  As Judge Dearie found, this motion was wholly without merit.  And even in the face of Defendant's objection to this billing, Plaintiff persists in seeking these fees, claiming that "UCS should not profit from its attempts to hide evidence."  (Revised Application 5.)

The Court raises this small part of the fee petition not only to support a reduction in fees sought for work done on a meritless motion, but to underscore, yet again, that despite Plaintiff's attempts to reduce the fees sought from his Original Application, the Revised Application still contains significant "fat."  It is troubling to the Court that Plaintiff's attorneys considered the Original Application as a type of "meet and confer" mechanism, one that could be used by the parties as a platform for narrowing the issues in dispute.  Evidence that Plaintiff's attorneys viewed the Original Application in this way can be found in an e-mail transmitted on December 11, 2009 by Brian Bromberg to UCS counsel, and copied to all of Plaintiff's attorneys.  It states:

> Although we agreed this afternoon that it was unlikely we would reach agreement on fees in [this] case, we might be able to close the gap somewhat.  When you are preparing you opposition brief, I ask that you specifically identify all hours, billing rates or expenses that will be objected to and the basis of any objections.  If you can get me your objections by Friday, December 18, 2009, we can attempt to bridge the gap somewhat without taking up the Court's time or incurring further expense.

> My suggestion is loosely based on N.D. Illinois Local Rule 54.3, which requires an
> exchange of records, attempts to meet and confer, and joint statements concerning
> remaining differences. I am certain that Judge Mauskopf would appreciate any good-
> faith efforts we can make to reduce our areas of disagreement so that she does not have to
> review eight years of records.

(Doc. No. 228, p. 4.)

Bromberg, on behalf of his colleagues, undertook these efforts more than a week *after* he

had served on Defendant his Original Application seeking in excess of $400,000 in fees.

Moreover, after shifting the burden to Defendant to object to fees, Plaintiff's attorneys put

themselves in the enviable position of unilaterally picking and choosing from hundreds of billing

entries spanning eight years and five firms those entries that they decided to eliminate to

"accommodate" Defendants objections. And they did so without any explanation of their

methodology or who carried it out, and largely through their own interpretation of myriad entries

that, to an objective reader, are completely vague or otherwise wholly devoid of identifying

information. Yet, similarly vague entries, or others that seem wholly related to those eliminated,

remain in the Revised Application. Using this approach, the attorneys managed to chip away

only $100,000 in fees, over $45,000 of which was the result of their own "error" in the hourly

rate of one of their own. Thus, Plaintiff has reduced his initial request by somewhat more than

$55,000, despite conceding on reply that the Revised Application eliminated or reduced

significantly entries relating to such categories as class certification, various discovery issues,

time spent procuring the WA settlement, phone consultations among co-counsel. *See generally,*

(Doc. No. 230).

Despite Mr. Bromberg's efforts to avoid it, this Court *has* painstakingly and thoroughly

"reviewed eight years of records." And the claimed scope of the reductions taken by Plaintiff are

belied by this Court's examination of the record. As the discussion herein shows, an across-the-

38

board reduction of 30 percent is wholly warranted.  As such, the following chart provides the

Court's calculations for the reasonable fees that will be awarded to each attorney,

a total of $168,701.58:

| Law Firm | Fee requests in Revised Application | | | Adjusted Hourly Rate | New Lodestar | 30% Reduction | FEES AWARDED |
|---|---|---|---|---|---|---|---|
| | Hours | Rate | Lodestar Amount | | | | |
| **Peter Marc Stern** | **58.75** | **$350** | **$20,562.50** | $200.00 | **$11,750.00** | **$3,525.00** | **$8,225.00** |
| Bromberg | 58.75 | $350 | $20,562.50 | $200.00 | $11,750.00 | $3,525.00 | $8,225.00 |
| **Bromberg Law Office, P.C.** | **287.9** | | **$81,595.00** | | **$55,412.50** | **$16,623.75** | **$38,788.75** |
| Bromberg | 201.5 | $350 | $70,525.00 | $275.00 | $55,412.50 | $16,623.75 | $38,788.75 |
| Hammer | 67.5 | $115 | $7,762.50 | $0.00 | $0.00 | $0.00 | $0.00 |
| Nag | 18.9 | $175 | $3,307.50 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Consumer Advocacy Center, P.C.** | **368.2** | | **$123,422.00** | | **$96,236.00** | **$28,870.80** | **$67,365.20** |
| Bromberg | 176 | $350 | $61,600.00 | $275.00 | $48,400.00 | $14,520.00 | $33,880.00 |
| Raphael | 116 | $350 | $40,600.00 | $275.00 | $31,900.00 | $9,570.00 | $22,330.00 |
| Bardo | 68.4 | $300 | $20,520.00 | $225.00 | $15,390.00 | $4,617.00 | $10,773.00 |
| Paralegals | 7.8 | $90 | $702.00 | $70.00 | $546.00 | $163.80 | $382.20 |
| **Langone** | **250.25** | | **$81,637.50** | | **$62,836.25** | **$18,850.88** | **$43,985.38** |
| Langone | 150.75 | $350 | $52,762.50 | $275.00 | $41,456.25 | $12,436.88 | $29,019.38 |
| Dabisch | 49 | $300 | $14,700.00 | $225.00 | $11,025.00 | $3,307.50 | $7,717.50 |
| Frisch | 44 | $300 | $13,200.00 | $225.00 | $9,900.00 | $2,970.00 | $6,930.00 |
| Paralegals | 6.5 | $150 | $975.00 | $70.00 | $455.00 | $136.50 | $318.50 |
| **Feofanov** | **53.7** | $350 | **$18,795.00** | $275.00 | **$14,767.50** | **$4,430.25** | **$10,337.25** |
| **TOTALS** | **1018.8** | | **$326,012.00** | | **$244,309.75** | **$73,292.93** | **$168,701.58** |

## F.  COSTS

An award of attorney's fees should "include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.' " *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998) (quoting *U.S. Football League*, 887 F.2d at 416).  Costs "incidental and necessary to the litigation" are recoverable. *Tips Exports, Inc., v. Music Mahal, Inc.*, 01-CV-5412, 2007 WL 952036, at *11 (E.D.N.Y. Mar.27, 2007); *see Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir.1987) (attorneys' costs "incidental and necessary to the representation" of their clients included in fee award).[23] Transportation costs generally are recoverable. *See Larsen*, 588 F. Supp. 2d at 365–66 (citing cases).  However, "expenses which are part of . . . attorneys' ordinary overhead are not to be reimbursed." *SEC v. Goren*, 272 F. Supp. 2d 202, 214 (E.D.N.Y. 2003) (citing *N.Y.S. Nat'l Org. for Women v. Terry*, 737 F. Supp. 1350, 1363 (S.D.N.Y. 1990)).

The parties here seek costs as noted in the chart below.  Defendants raise as their main objection that many of the billing entries, particularly those of the Bromberg Law Office, P.C. and CAC, are vague and lack sufficient detail to support the costs requested.  Since the filing of Defendant's opposition, Bromberg has submitted additional documentation to support his costs (*see* Revised Application, Exs. I–M), in the form of receipts, invoices and the like.  While the total amount of costs sought are not unreasonable in light of the protracted nature of this

---

[23] *See also, e.g., Simmons v. N.Y.C. Transit Auth.*, No. 02- CV-1575 (CPS)(RLM), 2008 WL 630060, at *7, (E.D.N.Y. Mar. 4, 2008) (finding costs relating to "filing fees, process servers, postage, travel and photocopying" to be reasonable expenditures for which plaintiff was entitled to reimbursement); *Cho*, 524 F. Supp. 2d at 212 (reimbursing plaintiff for costs related to "Federal Express, reproduction, telephone, facsimile, postage, deposition services, [and] deposition/hearing transcripts"); *Molefi v. Oppenheimer Trust*, No. 03-CV-5631 (FB)(VVP), 2007 WL 538547, at *8 (E.D.N.Y. Feb. 15, 2007) (finding that "costs associated with mailings, photocopies, and court fees . . . are precisely the type of costs that may be included in an award of attorney's fees"); *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279, 305 (S.D.N.Y.2001) (reimbursing plaintiff for costs relating to "photocopying, filing fees, Federal Express, [and] trial exhibits").

litigation, many specific requests are still not properly supported.  On this basis, the Court will

apply a 10% across-the-board reduction to the costs sought by these two firms.

| COSTS | | | |
|---|---|---|---|
| Law Firm | Costs Requested | 10% reduction | Costs Awarded |
| Peter Marc Stern | $306.72 | | $306.72 |
| Bromberg Law Office, P.C. | $9,813.15 | $981.32 | $8,831.84 |
| Consumer Advocacy Center, P.C. | $1,860.34 | $186.03 | $1,674.31 |
| Langone | [None Requested] | | |
| Feofanov | $355.49 | | $355.49 |
| TOTALS | $12,335.70 | $1,167.3490 | $11,168.3510 |

## IV.  CONCLUSION

For the reasons set forth herein, Plaintiff's Motion for Attorney's Fees and Costs (Doc.

No. 225) is GRANTED IN PART and DENIED IN PART.  Attorney's fees and costs shall be

awarded in the amounts set forth here, and the Clerk of Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
March 31, 2011

s/RRM

ROSLYNN R. MAUSKOPF
United States District Judge